**In re Jeffrey D. STEWART, Debtor.**

**Bankruptcy No. 96–01624–W.**

United States Bankruptcy Court,
N.D. Oklahoma.

Oct. 31, 1996.

Richard A. Shallcross, Tulsa, OK, for Debtor.

Katherine Vance, Assistant U.S. Trustee, Tulsa, OK.

*MEMORANDUM OPINION AND ORDER ON UNITED STATES TRUSTEE'S "MOTION TO DISMISS ..." RE APPLICATION OF 11 U.S.C. § 707(b)*

MICKEY DAN WILSON, Chief Judge.

This contested matter under 11 U.S.C. § 707(b) was tried to the Court and taken

under advisement. Upon consideration of evidence received, and of the record in this case and in the related Case No. 95–01081–W In re Patricia Ann Hill whereof judicial notice is taken, this Court, pursuant to F.R.B.P. 9014 and 7052, now finds, concludes, and orders as follows. Procedural history of the matter is included among "Findings of Fact"

### FINDINGS OF FACT

Jeffrey D. Stewart ("Stewart"; "debtor") and Barbara Teichner ("Barbara") were high school classmates. In 1976, they both entered Williams College in Massachusetts. A year and a half later, on or about March 21, 1978, they were married. They moved to San Francisco, California; then to Long Island, New York; then to Lake Placid, New York. They had four children, born in 1980, 1981, 1983 and 1987.

During these times, Stewart worked at various jobs—as a cook or baker, driving delivery trucks, teaching ice skating. His family's standard of living was minimal. But Stewart meant to become a doctor. During their short stay in Long Island, he resumed classes at Stonybrook College; and in Lake Placid, he took correspondence courses. Barbara's parents ("Mr. and Mrs. Teichner") helped by lending them money, which was used partly for living expenses and partly to pay for Stewart's schooling. Stewart also borrowed from commercial lenders under government-sponsored educational loan programs. Eventually he obtained a Bachelor of Science degree.

In 1988, Stewart (who was then about 30 years old, with a wife and 4 children) entered the University of Oklahoma medical school at Norman, Oklahoma. Here he met Patricia Hill ("Patricia"). Domestic difficulties ensued. Stewart transferred to the University of Oklahoma medical school at Tulsa, Oklahoma; and he and his family moved to Tulsa.

Stewart and Barbara separated sometime between April and July 1990. Stewart promptly commenced a "romantic liaison" and "conjugal relationship" with Patricia, debtor's ex. 5(L) p. 2, (T) p. 3 ¶ 12.

On July 14, 1990, Stewart signed promissory notes to Mr. Teichner in the amount of $150,000 and to Mrs. Teichner in the amount of $50,000. These notes represented monies which Mr. and Mrs. Teichner had advanced to Stewart and his family from 1978 to 1990. Mr. Teichner's note was "payable upon demand upon the termination of ... Stewart's medical training," debtor's ex. 4(C) ex. A.

On September 20, 1990, Barbara filed her petition for divorce in the District Court of Tulsa County, Oklahoma ("State court"), commencing Case No. FD–TU–90–006511–20 ("the divorce case"). The petition alleged "incompatibility," debtor's ex. 5(X) p. 1 ¶ 5; and sought approval of a "Marital Settlement Agreement," id. ¶ 6. The Marital Settlement Agreement ("the [marital] agreement") was dated September 20, 1990. It recited that Stewart, "in order to pursue his medical education without personal and family interruption ... is desirous of a legal separation or divorce and that [Barbara] agrees not to resist [Stewart]'s desires ...," debtor's ex. 5(M) ex. A pp. 1–2 ¶¶ I(4)–(5). It assigned to Barbara "the sole personal responsibility of raising the four young minor children of the marriage," id. p. 2 ¶ I(1). It required Stewart to pay "support alimony" of $500 per month until "completion of an accredited residency or ... becoming a licensed physician and training completed," id. p. 4 ¶ IV(1)(c), then $25,000 per year up to a total of $2 million, provided that, if Barbara remarried, the $2 million total would be reduced to $250,000. It required Stewart to "pay child support from his student loans in the amount of $500 per month per child for a total of $2,000" per month, id. p. 2 ¶ II(2), as well as his children's health insurance and medical expenses; and to pay "tuition, books, room and board" for his children's full-time college and post-graduate education, id. p. 3 ¶ II(5). It further provided that Stewart,

> ... upon graduation from medical school ... will obtain a residency which enables him to earn an income for the purpose of providing said child support,

*id.* pp. 2–3 ¶ II(4). The divorce decree was entered without contest on October 22, 1990. It approved the marital agreement, which was "specifically not merged into th[e] Decree," debtor's ex. 5(V) p. 2.

Stewart graduated from the University of Oklahoma medical school in Tulsa in Spring 1992, and commenced his internship and residency at the University of Oklahoma College of Medicine in Tulsa. At the same time, he ceased making support payments to Barbara. On June 30, 1992, Stewart moved to modify his child support payments, alleging

> that [he] has become a resident physician employed by the Oklahoma University Medical College; that his income from such employment is substantially less than the annualized amount of student loan proceeds that [he] had borrowed in prior years to meet his child support obligations; [and] that [he] is without the ability to borrow any further sums of money to meet the Court ordered child support obligation …,

debtor's ex. 5(U) p. 2 ¶ 4. Two weeks later, on July 15, 1992, Stewart moved to vacate the divorce decree, alleging that the decree suffered from procedural "irregularit[ies]", debtor's ex. 5(T) p. 2 ¶¶ 8, 9; that Stewart was forced into the marital agreement by Barbara's threat "to make public [his] extra marital relationship", *id.* p. 3 ¶ 13; and that he was overreached "at a time when [he] was without counsel," *id.* p. 4 ¶ 18. Stewart was now represented by Richard A. Shallcross ("Shallcross"). Barbara agreed to reduce Stewart's child support payment to $146.50 per child or a total of $586.82 per month, debtor's ex. 5(Q). She did not agree to vacate the divorce decree or otherwise modify the marital agreement.

In November 1992, Barbara met Larry Rose. On May 29, 1993, they were married.

On June 29, 1993, Mr. Teichner sued Stewart in State court on his $150,000 note, commencing Case No. CJ–TU–93–002931–1 ("the Teichner case"). Stewart made third-party complaint against Barbara, who answered and moved for summary judgment. Her mo-tion was eventually denied, and discovery proceeded.

In 1994, Patricia graduated from the University of Oklahoma medical school in Tulsa, and around September 1994 entered her residency at the Oklahoma University College of Medicine. At about the same time, she and Stewart moved in together at 1531 S. Columbia Avenue, Tulsa, OK 74104, see statements of financial affairs ¶ 15 in Case Nos. 95–01081–W, 96–01624–W.

On April 17, 1995, Patricia filed her voluntary petition for relief under 11 U.S.C. Chapter 7 in this Court, commencing Case No. 95–01081–W. She was represented in bankruptcy by Stewart's attorney Shallcross. With her petition, she filed statements and schedules as required by 11 U.S.C. § 521, F.R.B.P. 1007. Therein she described herself as "single," giving no hint that Stewart was living with her at the time. She reported take-home pay of $1,680 per month, expenses of $2,013 per month, assets worth $10,045 (most of which were claimed exempt), secured debt totalling $5,620, and unsecured debt totalling $153,895.47 (most of it student loans). Her Trustee reported no assets for distribution, see docket # 10. On August 16, 1995, her discharge was entered, see docket # 12.

Four and a half months later, on December 30, 1995, Patricia and Stewart were married.

In the Teichner case in State court, Teichner moved for summary judgment. On March 27, 1996, his motion was granted. On April 10, 1996, the State court entered judgment for Teichner on his complaint against Stewart, and also entered judgment for Barbara on Stewart's third-party complaint against her.

In the divorce case in State court, Stewart's motion to vacate the divorce decree was extensively pre-tried, debtor's ex. 5(K)–(P), (R)–(S), tried to the court on November 28, 1995, and continued to January 8, 1996. Sometime between those dates, Stewart bought himself a 1990 Range Rover, a 4-wheel–drive sport utility vehicle worth al-

most $40,000 new, for $26,466 payable at $630.21 per month. On January 8, 1996, trial resumed and was concluded; and Stewart's motion to vacate the divorce decree was denied. On January 19, 1996, the State court gave Barbara judgment against Stewart for $26,077.95 for breach of the marital agreement. Of this amount, about $21,500 was for past due spousal support, the rest for past due child support (unpaid medical bills).

Stewart moved for new trial. On April 16, 1996, the State court denied Stewart's motion for new trial, commenting as follows:

> ... [Stewart]'s claim of duress makes no sense. Even by his own testimony the feared revelation had already occurred when he began to negotiate the contract which ultimately became the Marital Settlement Agreement. [Stewart] has the fire hydrant chasing the dogs.

> ... [Stewart], a highly intelligent man in his last years of medical school, wanted a divorce and wanted it badly. He was intent on leaving the marriage and the problems of raising the four children born of it. [Barbara] was in ill health, virtually bedridden and saddled with children reacting adversely to the separation and impending divorce. [Stewart] contacted lawyers and was advised that he needed legal assistance.

> Whatever compelled [Stewart] to make the choices he did, it was not duress or [undue] influence exerted by [Barbara]. The pressure on him was internal and of his own making. He wanted a divorce "bad" and he got one—a bad divorce. [He] made a bad bargain but with eyes open, fully informed and under no threat other than dealing with his own conscience[,]

debtor's ex. 5(D) pp. 3–4. Stewart appealed; the appeal is now pending.

Two weeks later, on May 2, 1996, Stewart filed his voluntary petition for relief under 11 U.S.C. Chapter 7 in this Court, commencing the present Case No. 96–01624–W. He is represented in bankruptcy by Shallcross.

With his petition, Stewart filed statements and schedules as required by 11 U.S.C. § 521, F.R.B.P. 1007.

Stewart described himself as "married," but did not disclose his wife's income as required by Schedule I. He reported his own take-home income at $3,358 per month from three different sources, namely the "University of Oklahoma, College of Medicare [sic; Medicine?]/Tulsa," "St. Francis Hospital Service Personnel Associ[a]tes," and "Claremore Indian Hospital". He reported expenses of $7,804 per month, for a net deficit of income under expenses of −$4,446 per month. His monthly expenses included $850 for rent or home mortgage payment, $485 for utilities and home maintenance, $500 for food, $100 for clothing and $100 for laundry, $160 for health insurance plus $150 for medical expenses, $631 for payments on the Range Rover, $200 for gasoline, $75 for auto insurance, $166 for disability insurance, $200 in self-employment and Social Security taxes (in addition to $798 withheld from gross income), $50 for recreation, $50 for charitable contributions, $1,087 for "child support, alimony", and $3,000 for "Student loans".

Stewart reported assets worth $23,066, consisting of partial interests in 22 tracts of real estate in 5 counties valued at "NIL", the Range Rover, a 1978 Datsun valued at "NIL", and some other items of personal property. Most of the personalty was claimed exempt. He reported debts totalling $2,548,440.37. Of this, $15,244 was secured by the Range Rover. Stewart omitted his Schedule E (priority unsecured debts), and in his Schedule F reported both priority and general unsecured debts totalling $2,533,196.37. Most of this consisted of Barbara's claim, which Stewart set at $2 million. The rest included student loans of at least $272,133 plus several "Unknown" amounts; $170,000 and $60,000 owing to Mr. and Mrs. Teichner respectively; attorney fees of at least $14,317.37 plus several "Unknown" amounts; tax debts of at least $4,000 plus several "Unknown" amounts; numerous "Children's medical bills" and "Children's medical expenses" totalling at least $7,944

plus some "Unknown" amounts; and debts for "all post-secondary school education expenses," which he specified that he "seeks to discharge".

On May 22, 1996, Barbara moved for relief from stay to enforce and collect on the divorce decree, marital agreement and judgment for support arrears. Stewart objected. After hearing on June 6, 1996, the Court granted the motion in part and continued the matter.

In June 1996, Stewart completed his residency.

On June 20, 1996, Stewart filed his complaint against Barbara in this Court, commencing Adv. No. 96–0205–W. Stewart asserted that his debts under the marital agreement are not true alimony or support but merely property division, are excessively hard for him to repay, and accordingly should be discharged under 11 U.S.C. § 523(a)(5)(B), (15). The complaint acknowledges Barbara's remarriage, see p. 4 ¶ 15.

The Court took steps to coordinate litigation of the motion for relief from stay and the adversary proceeding. But another matter intervened.

On July 5, 1996, the United States Trustee by his Assistant in this District ("the UST") moved to dismiss Stewart's bankruptcy case as a substantial abuse of Ch. 7 under 11 U.S.C. § 707(b). The UST alleged that Stewart was employed by the University of Oklahoma College of Medicine, St. Francis Hospital Service, and Claremore Indian Hospital, "and there is no indication that [his] employment will be terminated any time in the near future," motion unnumbered p. 2 ¶ 10; that in June 1996 Stewart had completed his residency in obstetrics-gynecology ("OB/GYN") "and his earning potential is approximately $100,000.00 to $250,000.00," id. p. 1 ¶ 3; that he "is currently under fellowship with the University of Oklahoma for maternal fetal medicine, which consists of training as a high risk obstetric specialist," and "[u]pon completion of [his] fellowship, (on or about July 1, 1998), [his] earning

potential will be approximately $250,00[0].00 to $500,000.00 per year contingent upon workload and success," id. ¶¶ 4–5; that he had grossly overstated his debt to Barbara; and that he had "fail[ed] to report the income of his current spouse who is a practicing physician and contributes to the payment of the monthly expenses," id. unnumbered p. 2 ¶ 8. The UST asserted that Stewart's "sole purpose [in] filing bankruptcy is to discharge marital and family obligations ... when he is able to pay a substantial portion of his debts, and no reasons appear for [his] inability to do so," id. ¶¶ 9, 11.

On July 22, 1996, Stewart filed his objection to the UST's motion to dismiss, and a brief in support thereof. On the same date, Stewart also filed amendments to his statements and schedules.

In his amended Schedule I, Stewart alleged that his former jobs had all terminated "on or about June 30, 1996," and that he was now employed at the University of Oklahoma Health Sciences Center in Oklahoma City for "take home pay .. [of] $2,556" per month. In an attached "1996 income projection" he alleged "Monthly Average Take Home Pay as of Date of Filing" of $3,908, "Ave[rage] Monthly Income–1996" of $3,403, and "Total Estimated Income 1996" of $40,840 subject to various contingencies. He still did not disclose his wife's income. In his amended Schedule J, Stewart reduced some monthly expenses and increased others, i.e. $50 for laundry, $474 for utilities and home maintenance, $50 for laundry, $300 for gasoline, and $3,123 for student loan payments and miscellaneous other expenses. The result was a slightly larger total living expense of $7,966 per month, for a net deficit of income under expenses of − $4,563. Stewart now described his expenses as his "[s]hare" or "monthly contribution" of "[h]ousehold" expenses. The latter (i.e., Stewart's and Patricia's joint expenses) totalled $10,729 per month, consisting of $1,130 for rent or home mortgage payment, $584 for utilities and home maintenance, $800 for food, $100 for clothing and $110 for laundry, $160 for health insurance plus $250 for medical expenses,

$631 for car payments, $464 for gasoline, $153 for auto insurance, $316 for disability insurance, $250 in self-employment and Social Security taxes, $150 for recreation, $50 for charitable contributions, $1,087 for "child support, alimony", and $4,534 for student loan payments and miscellaneous other expenses including "[r]evolving [c]harge," veterinary bills, hair care, "[f]itness center," and "gifts, food, entertainment" for "[k]ids".

In his amended Schedules A–B, Stewart devalued his assets slightly, to $22,591. In his amended Schedules D–F, he increased his debts slightly, to $2,602,253. In his Schedule E (which had been omitted from the original schedules), he reported priority claims totalling $2,004,500.00, consisting of Barbara's claim under the marital settlement agreement (still listed at $2 million) plus $4,500 in Federal and State taxes. In his amended Schedule F, he deleted the alleged debt to Barbara of $2 million, decreased the student loan debt to a total of $218,887 (noting that "Loans currently in default are demanding payment in full today" and that "SLS program is currently garnishing 10% of my take home pay"), increased Mr. and Mrs. Teichner's claims to $239,671 and $80,000 respectively, added a "medical malpractice" claim for "[i]n excess of $10,000", and made other, relatively minor adjustments, for a total general unsecured debt of $582,509.

The Court continued the motion for relief from stay and the adversary proceeding, and extended the deadlines for filing complaints under 11 U.S.C. §§ 523, 727, until after the motion to dismiss and objection thereto had been disposed of. Procedural difficulties ensued, due to Stewart's argument that the UST's motion to dismiss was "contaminated" by the activities of Barbara and her attorney. The Court rejected this argument, and the UST's motion to dismiss and Stewart's objection thereto were tried to the Court on October 1, 1996.

Madelyn Dalton, Dept. Supervisor, Labor and Delivery at St. Francis Hospital, and Paul Mobley, D.O., Medical Director of Claremore Indian Hospital, testified (by writ-

ten stipulations) that Stewart no longer worked for either of their institutions.

William Rayburn, M.D., John W. Records Chair, Professor and Chief of the Maternal–Fetal Medical Section, Dept. of OB/GYN, University of Oklahoma College of Medicine ("Dr. Rayburn"), testified (by written stipulation) as follows. Dr. Rayburn is Stewart's current supervisor in a 2–3 year work-fellowship program at the Oklahoma University College of Medicine in an OB/GYN subspecialty called "maternal-fetal medicine" or "perinatology" which concentrates on "complications of pregnancy . . . extremely premature newborns . . . obstetric patients with potentially lethal infections diseases such as AIDS, hepatitis, TB . . ." and the like. Pursuant thereto, Stewart's "responsibilities include teaching, research, patient care, and graduate course work" taking "80–100 hours per week". Stewart's "base salary contract" is for $34,292 for the year 1996–1997, about $35,000 for 1997–1998, and about $37,000 for 1998–1999. After the first year, this "base salary" can be supplemented by "bill[s] as attending physician". However, many "patients . . . are indigent, with reimbursement from Medicaid (if at all)"; and "[o]utside employment (moonlighting) is strongly discouraged due to the tremendous time commitment required by the program". "Board certification as a [perinatology] subspecialist comes 2–3 years after completion of the program". "Earning potential prediction is very speculative," but "[a] recent (12/95) survey among [perinatology] program graduates ha[s] estimated current starting salaries for recent . . . graduates (not yet board certified) . . . [at] approximately $100,000–$150,000 annually".

James Beeson, M.D., Ph.D., Chairman of the Dept. of OB/GYN at the Oklahoma University College of Medicine in Tulsa, testified (by written stipulation) as follows. Dr. Beeson has known Stewart since 1990. Stewart "has planned on a career in [perinatology] since 1991". Stewart's interest in and dedication to research is "unusual" and has brought Stewart "several research . . . teaching . . . and academic achievement awards

during the past few years". Dr. Beeson agrees with the testimony of Dr. Rayburn.

The UST presented evidence that, from 1991 through 1995, OB/GYN specialists have earned salaries averaging in the range of $175,000 to $325,000. Since these are average figures, some doctors make less, while some make more. The highest salaries exceed $500,000 per year.

Stewart testified in person, as follows. The money borrowed from Mr. and Mrs. Teichner was used for anything Stewart's family needed to pay, including vacation bills. His multiple real estate holdings (which are a family property, descending to Stewart from his father and grandfather) bring him only $100–$200 per year. His current living expenses are high because his new job in Oklahoma City requires him to maintain two households—a rented home in Tulsa and an apartment in Oklahoma City—and to drive back and forth between them. Since filing his amended schedules, he has economized by dropping his health club membership and his disability insurance. He has "always" wanted to be a doctor; he has been working hard to become one for 20 years; and he is now specializing in the treatment of high-risk pregnancies so that he can help desperately-ill and needy mothers and babies. He is passionately interested in research, and intends to pursue it regardless of remuneration. If he were now in private practice as an OB/GYN, he should be earning some $80,000–$100,000 per year.

Barbara testified in person, as follows. Her parents loaned money to Stewart's family, to facilitate Stewart's education while maintaining his family in a "certain life style" that would otherwise have been beyond their reach. Barbara has health problems due to a liver deficiency, which interfere to some extent with her ability to work and to care for her children. Larry Rose, who owns several retail shops in Tulsa, now supports Barbara and contributes to the support of her children. Barbara has been a part-time law student at the University of Tulsa for several years, and is in the top 20% of her class. (She has also incurred over $100,000 in student loans. The court notes that Stewart, Patricia and Barbara among them now owe more than $500,000 in student loans.)

Any "Conclusions of Law" which ought more properly to be "Findings of Fact" are incorporated herein by reference.

## CONCLUSIONS OF LAW

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (O ), 11 U.S.C. § 707(b).

The UST moves to dismiss Stewart's case under 11 U.S.C. § 707(b). This statute provides as follows:

> After notice and a hearing, the court, on its own motion or on a motion by the United States Trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

Section 707(b) was not part of the Bankruptcy Code as enacted in 1978, but was added under somewhat obscure circumstances in 1984, seemingly in response to complaints by creditors that debtors who could afford to pay their debts, in whole or at least in part, were discharging them instead by casual resort to Ch. 7. See 4 *Collier on Bankruptcy* (15th ed. 1996) ¶ 707.04 pp. 707–15, –16 and n. 4.

Section 707(b) states that "... the court, on its own motion or on a motion by the United States Trustee, but not at the request or suggestion of any party in interest, may dismiss a case ..." The UST is the Federal agency charged with duty of assisting the Bankruptcy Court in supervising and policing the bankruptcy process, *In re Vance,* 120 B.R. 181, 185 (B.C., N.D.Okl.1990). As noted above, Stewart argued that Barbara and her attorney "request[ed]" or at least "suggest[ed]" to the UST that action be taken

against Stewart, and that such request or suggestion contaminated the UST's motion and required its denial with prejudice. According to Stewart, the UST is required to make its decision whether or not to move for dismissal under § 707(b) in strict isolation from any input by creditors.

Stewart misreads the language of the statute. The phrase "but not at the request or suggestion of any party in interest" modifies "court", not "United States Trustee". The statute requires the *court* to refuse to entertain any motion to dismiss under § 707(b), however disguised, which is brought before the Court by anyone other than the UST. It does not require the *UST* to try to do its duty from an ivory tower.

Stewart also disregards the probable intent of Congress. It seems that Congress did not want § 707(b) itself abused by creditors who might harass debtors. Such intent is fulfilled by requiring creditor accusations to be reviewed and "filtered" by the UST before being filed. It is unnecessary for Congress to go further. It is (to say the least) improbable that Congress would go so much further as to disable the Bankruptcy Court from policing its own process, and require it to sit by and watch its own jurisdiction abused, merely because a third party in good faith took the perfectly reasonable step of bringing evidence of such abuse to the attention of the Federal agency whose job it is to help the Court supervise the bankruptcy process!

For these reasons, this Court allowed the UST to proceed with its motion, notwithstanding any pre-motion "suggestion" to the UST by Barbara or her attorney. Accord, *U.S. Trustee v. Clark*, 927 F.2d 793 (4th Cir.1991).

■ Section 707(b) applies to "... an individual debtor ... whose debts are primarily consumer debts ..." Stewart argues that his debts are not "primarily consumer debts".

Stewart's debts fall into the following main categories: (1) Barbara's claim for spousal support alimony; (2) Barbara's claim on behalf of their children for child support; (3) sums owed to Mr. and Mrs. Teichner; (4) sums owed to institutional lenders; and (5) others. Stewart sets Barbara's claim for spousal support alimony at $2 million, but after her remarriage, it is clear that this claim must be reduced to $250,000. Stewart currently owes his children some $8,000 for past due medical bills (which is included in Barbara's judgment against him); his obligation to pay his children's college expenses is contingent and unliquidated. Stewart owes Mr. and Mrs. Teichner some $320,000, and owes institutional lenders over $200,000. Stewart's taxes and attorney fees total about $20,000; his other debts are inconsequential.

Stewart borrowed from the Teichners and from institutional lenders, partly to pay for college and medical school tuition and other "direct" educational expenses, but largely to pay for his and his family's normal living expenses during his long period of part-time and/or low-paying employment, and to some extent to pay his spousal and child-support obligations after his divorce (as expressly stated in the marital settlement agreement). These debts, directly or indirectly related to Stewart's long period of education, total some $520,000, and are the major part of Stewart's total debt. Stewart argues that these obligations are not "consumer debt".

Stewart cites *In re Gentri*, 185 B.R. 368 (B.C., M.D.Fla.1995). But this case assumes, rather than decides, the point in question, *id.* p. 373.

11 U.S.C. § 101(8) defines "consumer debt" as "debt incurred by an individual primarily for a personal, family, or household purpose". This definition (unlike § 707(b) itself) was part of the Bankruptcy Code as originally enacted in 1978. In the original Code, the term "consumer debt" was used in an operative context only twice: in 11 U.S.C. § 523(d), which provides a remedy to consumer debtors harassed by unjustified creditor accusations under § 523(a)(2); and in 11 U.S.C. § 1301, which extends the automatic stay under 11 U.S.C. § 362 to co-debtors of consumer debtors in Chapter 13 cases. Leg-

islative history contains remarks that "[a] consumer debt does not include a debt to any extent the debt is secured by real property," 124 Cong.Rec. S17,406 (daily ed. 10/6/78) (statement of Sen. DeConcini), 124 Cong.Rec. 32,393 (1978) (statement of Rep. Edwards). These remarks contradict the plain meaning of the statute itself, *In re Kelly*, 841 F.2d 908, 912 (9th Circ.1988). Perhaps they are explicable with reference to the special treatment of debts secured by residential real property in Chapter 13, see 11 U.S.C. § 1322(b)(2); that need not be decided now. It does appear that, within the wide range of meaning permitted by the statutory text of § 101(8), the term "consumer debt" can mean different things as it is applied for different purposes in different operative sections of the Code, *In re Higginbotham*, 111 B.R. 955, 960 (B.C., N.D.Okl.1990).

Section 707(b) was not enacted to narrow and discourage Court review of abusive cases, but to broaden and encourage such review. The term "consumer debt" as used in § 707(b) serves to direct the Court's attention to a type of bankruptcy case which is especially liable to abuse and especially deserving of review. That type of case involves an individual debtor who voluntarily (in the sense of "on his initiative, at his option") takes advantage of modern easy-credit practices to accumulate debts, for the immediate purpose of satisfying his private appetites and maintaining or enhancing his personal qualities and lifestyle, or those of his dependents—often in circumstances which offer creditors little security, because the benefits acquired by the debts are used up ("consumed") by the debtor himself and assimilated to his person—and who effectively avoids repayment by keeping his unconsumed property and his income from wages or professional earnings to himself and from his creditors, despite even bankruptcy, e.g. pursuant to 11 U.S.C. §§ 522(b), 524(a)(2), 541(a)(6). The term "consumer debt" as used in § 707(b) should be construed broadly enough to accomplish the Congressional purpose of permitting and encouraging judicial review of such cases.

A classic case is the debtor who "binges" on credit cards while dissipating the funds on luxury vacations, high-priced meals, and gambling. Although this is a classic case, it need not be the only case. Modern easy-credit practices are not limited to signature loans and credit cards. They include student loans, which are made available by commercial lenders under non-commercially lax standards by arrangement with governmental units acting on grounds of social policy. It makes little difference whether student loan funds are used "directly" to pay tuition or "indirectly" to pay living expenses during a period of schooling: either way, the money is used to enable the debtor to acquire further education. No one forces a debtor to incur student loans; such debts are incurred on debtor's own initiative, at his option, in hopes of enhancing those most personal of qualities, the functioning of his own mind and his own hands, and thereby benefiting himself, his family and his household for the rest of his life. Such intangible benefits, acquired with creditors' money, are assimilated to the debtor's own person, and cannot be conserved as security for payment of the debt. But if the debtor's higher education gains him a higher salary, he can keep that benefit to himself, especially if he uses bankruptcy to cancel his creditors' right to use *in personam* debt collection methods. In effect, the student borrower gets "personal" benefits while avoiding "personal" payment. This scenario differs from the credit-card binge only in incidental details. Intra-family loans for educational purposes are also indistinguishable in principle. The only difference is that in such instances, easy credit results from personal relationship.

Courts have held that a "consumer debt" for purposes of § 707(b) is one which has no "profit motive", *In re Booth*, 858 F.2d 1051, 1054–1055 (8th Circ.1988); *In re Kelly*, 841 F.2d 908, 913 (9th Circ.1988); *In re Nolan*, 140 B.R. 797, 800–801 (B.C., D.Col.1992); *In re Bell*, 65 B.R. 575, 577 (B.C., E.D.Mich. 1986); *In re Almendinger*, 56 B.R. 97, 99 (B.C., N.D.Ohio 1985). Profit motive is relevant but not necessarily decisive, for several

reasons. First, there are the facts of this case. The evidence shows that a significant part of the funds from Stewart's so-called student loans went to pay living expenses, vacation expenses, and the like for Stewart and his family, during the long period of his education as a doctor. And Stewart himself emphasized his long-standing personal ambition, humanitarian zeal and disregard of immediate high income. He is in no position to insist that his student loans were incurred for profit and not for "a personal, family, or household purpose". Also, there are certain considerations of principle and of statutory construction. Few human activities are entirely innocent of a profit motive; and it is "perverse ... [to] credit Congress ... with enacting § 707(b) with the specific design that it apply to almost no one," *In re Higginbotham,* 111 B.R. p. 960. Courts should be cautious of replacing the terms of statutes, and the sometimes complex legislative considerations which they encapsulate, with oversimplified judicial catch-phrases like "profit motive". Congress did not define "consumer debt" as a "debt incurred by an individual having no profit motive," but rather as a "debt incurred by an individual for a personal, family or household purpose". Nothing is more intimately "personal" than the debtor's own education—what goes, so to speak, between the debtor's own ears. Debts for loans which further that "personal" endeavor, whether the source of the money be institutional or intra-family, come within the literal terms of "consumer debt" as defined in § 101(8), and within probable Congressional intent in employing such term(s) in § 707(b).

Neither party apprised the Court of the case of *In re Burns,* 894 F.2d 361 (10th Circ.1990). In that case, the Court of Appeals of this Circuit denied an award of attorney fees under 11 U.S.C. § 523(d), ruling that a bank loan which was "tak[en] out ... in order to play the stock market" was "clearly a transaction entered into with a profit motive" and was "not a consumer debt", *id.* p. 363. This case is distinguishable, for several reasons. The term "con-

sumer debt" deserves a narrow construction for purposes of § 523(d), which is a fee-shifting statute. The debt in *Burns* was not an easy-credit situation, but a commercial-style bank loan obtained through a bank loan officer, *id.* p. 361 n. 3. And the loan in *Burns* was not "personal" within the literal terms of § 101(8).

For these reasons, Stewart's debts, both to the Teichners and to institutional student-loan lenders, should be treated as "consumer debt" whether or not they were incurred for an indirect, incidental or ultimate profit motive. Stewart's case involves certain peculiar facts which make it especially appropriate to treat such debts as "consumer debt". However, it appears to this Court that student loans in general should be treated as "consumer debt", at least absent unusual facts or factors of which this Court is not presently aware.

Regarding Stewart's other debts, the Court notes that Barbara's claim (which Stewart himself sets at $2 million) for alimony and her claim on behalf of the children for child support are for "a personal, family, or household purpose" and thus within the literal definition of "consumer debt" under § 101(8). Whether such claims fit within Congressional intent as outlined above is another question. Luckily, it need not be answered now. It suffices to point out that Stewart's debt arguably consists almost entirely of "consumer debt," especially if one accepts Stewart's own figures. Stewart's attorney recognizes the probability that Stewart's alimony debt is "consumer," although he seems to have forgotten that his own client set its value at $2 million, Stewart's brief pp. 10–11 citing *In re Palmer,* 117 B.R. 443 (B.C., N.D.Iowa 1990). See also *In re Traub,* 140 B.R. 286, 289 (B.C., D.N.M.1992).

Whatever the exact parameters of "consumer debt," the Court is convinced that Stewart's debts are "primarily consumer debt," and that § 707(b) does apply. The next step is to apply it.

The term "substantial abuse" is not defined by the Bankruptcy Code. This

Court has held that the term signifies the application of basic principles of "equity and judicial power and responsibility" in the specific context of Ch. 7 bankruptcy relief as intended by Congress, and

> would seem to include that situation wherein relief under Chapter 7 is unnecessarily prejudicial to creditors, in that there is no apparent emergency, disaster or untenable situation to be remedied—relief under Chapter 13 is available, is not unduly burdensome to debtors, and would result in repayment of all or most of debtors' outstanding debt within the term of a Chapter 13 plan—while Chapter 7 relief would result in little or no dividend to creditors and would amount to a reward for debtors' own lack of diligence or judicial blessing of an unconscionably one-sided, opportunistic adjustment of the debtor-creditor relationship.

*In re Higginbotham*, 111 B.R. pp. 963, 964. All relevant circumstances should be considered, including but not limited to the debtor's ability to repay his debts.

Stewart is under considerable financial pressure. He is obliged to pay Barbara $250,000 at the rate of $25,000 per year for ten years; he owes twice that much to her parents and his institutional student-loan lenders; and his other debts, though relatively small, actually add up to two or three times what the average American earns per year.

Stewart has considerable earning potential. By his own admission, he could be making $80,000–$100,000 per year right now, fresh out of medical school. According to his own witnesses, he will soon be capable of earning up to $140,000 per year. According to the UST, as Stewart gains experience over the next few years his earning potential could rise much higher—the figure of $140,000 per year could double, or even triple. His current wife is also a doctor, and their combined earning potential is enormous—from ten times to twenty times what the average American makes in a year, perhaps even more.

Although the issue is not directly before the Court, it appears that Stewart's institutional-lender student loan debts are not dischargeable in bankruptcy, pursuant to 11 U.S.C. §§ 523(a)(8)(B), 1328(a)(2)—because their repayment would not be an "undue hardship", see e.g. *In re Heckathorn*, 199 B.R. 188, 192 (B.C., N.D.Okl.1996); *In re Claxton*, 140 B.R. 565, 568 (B.C., N.D.Okl. 1992). The main effect of Stewart's Ch. 7 bankruptcy would be to discharge the debts he owes Barbara (to the extent they are determined to be dischargeable, as asserted in Stewart's complaint in Adv. No. 96–0205–W), her parents, and his own children, along with the relatively inconsequential debts in the "other" category. It is apparent from the course of the State court litigation, the timing of his petition in bankruptcy, and other circumstances (such as buying an expensive recreational vehicle while refusing to pay his children's medical bills) that Stewart has no intention of honoring the notes he gave Mr. and Mrs. Teichner, the marital agreement with Barbara, or his legal and moral obligation to support his own children. It further appears that Stewart conceives of this Ch. 7 bankruptcy as his ultimate escape from the demands of his domestic creditors.

To facilitate his passage through Ch. 7, Stewart exaggerated his debts and minimized his income. Stewart "denies that there is a legal requirement upon him to include his non-debtor wife's income in his schedules," Stewart's response unnumbered p. 3 ¶ 8. He is correct; Official Form No. 6, Schedule I, requires disclosure of a non-debtor spouse's income only "in a chapter 12 or 13 case". The fact remains that by omitting Patricia's income, Stewart presented a seriously misleading picture of his actual financial status. As this Court has elsewhere stated, in a case involving a debtor who systematically omitted inconvenient information from his statements and schedules,

> This is not a game … The schedules and statements are not intended merely to tease the Trustee and creditors; they are intended to present an *accurate and complete* description of the debtor's financial

affairs; they must be read *and written (filled out)* accordingly ... [T]hese "monkeyshines" ... were obviously intended to put over a grossly inadequate and thoroughly misleading impression of [debtor]'s financial affairs without actually committing a bare-faced lie. The problem with this sort of brinkmanship is that it sometimes carries one over the brink,

In re Cummins, Case No. 95–03256–W, Sherrod Associates, Inc. et al. v. Cummins, Adv. No. 96–0028–W, unpublished "Memorandum Opinion and Order" filed 8/26/96 pp. 19, 29. In the Cummins case, the issue was whether debtor had made a false oath for purposes of denial of discharge under 11 U.S.C. § 727(a)(4). That issue is not presented here; but such "misrepresent[ation of] financial position" is a factor "bearing on 'substantial abuse,' " *In re Goodson*, 130 B.R. 897, 901 (B.C., N.D.Okl.1991); *In re Cook*, 110 B.R. 544, 548 (B.C., N.D.Okl.1990).

What Stewart did not do is "tighten [his] belt," *In re Goodson*, 130 B.R. p. 901. His reported expenses are "improvidently high," *id.*, (e.g. $500/month for food for one person, $800/month for food for two; and car payment and transportation expenses of about $1,000/month for one person and one vehicle). Stewart claims to spend some $4,500 more than he takes home *every month*, month after month. This is incredible, and certainly unnecessary. Stewart maintains two households in two different cities, and drives back and forth between them—but the second home in Oklahoma City is kept to facilitate his travel to work at a new job that pays him *less* (very much less) than he is capable of earning. Stewart's only concessions to financial exigency are to drop his health club membership and trim his insurance payments. It is clear that Stewart could do much more, both to increase his earnings and to decrease his expenses.

The relevant circumstances include the bankruptcy of Stewart's new wife Patricia. Her earlier, separate Ch. 7 case, which she filed soon after her graduation from medical school at a time when her earning potential was increasing, and which misrepresented her true financial picture by omitting mention of her household arrangement with Stewart, whom she did not formally marry until after her discharge was granted, was effectively fraudulent. It is now too late to revoke her discharge, see 11 U.S.C. § 727(d)(1), (e)(1). In its convenient timing and studiously misleading statements and schedules, Patricia's bankruptcy resembles Stewart's.

Stewart attributes high moral purpose to himself. He has a mission to save the ailing mothers and babies of the world. To further his noble end, he intends to sacrifice his own ailing ex-wife and their children (not to mention the children's grandparents). He justifies this to himself, and attempts to justify it to this Court, by pointing out that Barbara and the children are now so financially well-off that they do not need his support.

The point is not whether they need it, but whether he owes it to them. He does. And he can afford to pay what he owes, to them and to all his other creditors—if not all at once, then certainly over time, within the near and foreseeable future, entirely from his own earnings if need be, but certainly with the help of his current wife, whose own considerable earnings can support them while Stewart pays his just debts.

Stewart is not currently eligible for Ch. 13, see 11 U.S.C. § 109(e). He owes too much. But he is eligible for Ch. 11, see 11 U.S.C. § 109(d). That chapter is open not only to business reorganizations but to individuals with non-business debts as well, *Toibb v. Radloff*, 501 U.S. 157, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991). To whatever extent Stewart needs relief from his creditors' collection efforts, he can achieve it in Ch. 11, without heedless discharge of debts which can and should be repaid.

Although Stewart is under financial pressure, he has the means to meet it, without resort to Ch. 7. There is no emergency, disaster or untenable situation to be remedied. Relief under Ch. 13 is not available; but relief under Ch. 11 is available, is not unduly

burdensome to Stewart, and would result in repayment of all or most of his outstanding debt within a reasonable time. Ch. 7 relief would result in little or no dividend to creditors, and would amount to a reward for Stewart's own financial improvidence and judicial blessing of an unconscionably one-sided, opportunistic adjustment of Stewart's relationship with his domestic creditors.

The Court concludes that the granting of relief herein would be a substantial abuse of the provisions of Ch. 7; and that this case should be dismissed under 11 U.S.C. § 707(b). Accord, see e.g. *In re Palmer,* 117 B.R. 443 (B.C., N.D.Iowa 1990); *In re Shands,* 63 B.R. 121 (B.C., E.D.Mich.1985).

However, Stewart's attorney has asserted that § 707(b) violates the United States Constitution; and has asked for an opportunity to brief that matter. Accordingly, Stewart by his attorney may file any brief regarding Constitutional issues affecting § 707(b) on or before November 22, 1996. If no such brief is filed within that time, this case shall be forthwith dismissed. If such brief is filed within that time, the UST may file any response on or before December 13, 1996; and thereupon the matter will be taken under advisement.

AND IT IS SO ORDERED.