**In re Lisa Beth CAMPBELL, Debtor.**

**Bankruptcy No. 86–01293–2.**

United States Bankruptcy Court,
W.D. Missouri.

Aug. 15, 1986.

---

William Lopez, Kansas City, Mo., for debtor.

Scott B. Haines, Kansas City, Mo., for Lawrence Nat. Bank.

## MEMORANDUM OPINION AND ORDER

FRANK W. KOGER, Bankruptcy Judge.

This matter comes before the Court on a question involving the 1984 Amendments to Section 707(b) and the permissable activities of creditors thereunder. Debtor filed her petition under Chapter 7 on March 20, 1986. Debtor's initial schedules showed monthly income of $3,000.00 per month and estimated monthly expenses of $1,520.26, leaving disposable income of $1,479.74 per month. Debtor is a Medical Doctor who had terminated her practice and obtained employment with a group of physicians. She showed $16,021.64 in priority claims which were primarily estimated federal, state and city taxes. Her secured debt was $24,160.36 which was a mortgage on her apartment, a mortgage on her car and a mortgage on her tools of the trade. From the schedules the secured creditors were in the main oversecured. She had an unquantified debt to her attorneys, an unquantified debt to her accountants (which she stated she would reaffirm) and a debt of $86,747.56 to the Lawrence National Bank & Trust Company which in effect was all she was discharging. The Bank having known from a time that the memory of man runneth not to the contrary that doctors may be slow pay but always eventually pay because they all become rich, understandably felt unfairly abused by this turn of events.

Thereupon the Bank perused the schedules, and blew the whistle by filing what they denominated as "Suggestions of Lawrence National In Opposition to Discharge". These were filed, not as an adversary action, not as a motion, but apparently as an assistance to the Court in the event that the Court would otherwise fail to recognize the signal flags of substantial abuse. The flavor of the pleading can be demonstrated by quoting the first sentence and last sentence therein.

"Comes now Lawrence National Bank, creditor herein, and suggests the denial of discharge of Debtor in these proceed-

ings by reason of application of 11 U.S.C. Section 707(b)".

and

"Wherefore, Lawrence National Bank suggests the propriety of this Court's denial of a discharge of Debtor herein, and for entry of such other appropriate orders as the Court deems just and equitable in the premises".

While the Court certainly stands in dire need of all the assistance it can get, debtor was not nearly as appreciative of the Bank's voluntary assistance. She immediately filed a Motion to Strike Suggestions and for Sanctions. The plea for the latter was as follows:

"Debtor requests that the Court sanction Creditor, Lawrence National Bank, by awarding reasonable attorneys' fees and expenses incurred in the defense of Creditor, Lawrence National Bank's frivolous and unauthorized pleading".

Thus, three subsidiary issues were raised for the Court to decide: (1) should the pleading of the Bank be considered by the Court in its otherwise lonely deliberations under Section 707(b)?; (2) Do such suggestions poison the process, so that any independent investigation by the Court is tainted and would constitute what in criminal practice parlance would be termed "fruit of the poison tree"?; (3) should the Court impose sanctions on an aggressive creditor who has overstepped the boundaries of the statute?

The answers are complicated by the apparent inconsistencies of Congressional intent. The Bankruptcy Reform Act of 1978 was apparently designed by Congress to be a self operating unit. Debtors were supposed to fulfill certain functions, creditors were to fulfill certain functions, and the Courts were to be far more removed from the day to day function of the process. E.G., the U.S. Trustee Pilot Project; the lack of jurisdiction of a judge to dismiss sua sponte, a nonfunctioning Chapter 11; the removal of the judge from the first meeting of creditors. While one may agree or disagree with the philosophy, arguably it would be hard to find anyone who would disagree that if the components do not function, as for example, when a creditors committee does nothing, the entire system fails its function. Thus, it seems that Congress clearly intended that creditors participate fully in the process and in effect relied on creditors to police the actions (or lack thereof) of the debtors.

Against that background in 1984 Congress enacted Section 707(b), which required the concept of "substantial abuse" to be the exclusive province of the bankruptcy judge. Apparently his decision was to spring full panoplied from the judge's mind as Minerva did from Zeus's head. The pertinent portion says:

"... the court, on its own motion and not at the request or suggestion of any party in interest, ..."

The legislative history is far stronger. The comments of Senator Metzenbaum are even more explicit, to-wit:

"I also am extremely pleased that this bill prohibits creditors from filing motions attempting to deny bankruptcy relief to individuals because of substantial abuse. If a creditor asks a court to dismiss a case claiming that there has been substantial abuse of the bankruptcy laws by the debtor, the court would not be allowed to do so. Only a bankruptcy court, acting on its own initiative, could dismiss a case involving substantial abuse. This will preclude creditors from making bankruptcy too expensive for the debtor by filing harassing motions alleging substantial abuse. 130 Congressional Record S7624, S7625 (June 19, 1984).

Thus, the clear dichotomy of the intent of the 1978 Act—to require the creditors to police the acts or omissions of the debtors—and the intent of the Section 707(b) amendment—to take the creditors completely out of the ambit—is demonstrated. One final factor must be weighed and that is the practical one of present practice. When the average filing per judge is some 1600 or more and many districts are allowing wholesale waiver of discharge hearings, who watches the debtors? The an-

swer is no one! Since reinstituting discharge hearings in this Court upon becoming the Judge, this writer has been appalled at the number of cases where the disposable income (for 36 months) shown on the filed schedules exceeded the total indebtedness. This month this Court refused discharge in a Chapter 7 case where a Chapter 13 proceeding using one-half of the scheduled disposable income would have paid the entire scheduled indebtedness in 13⅓ months. Strangely, no creditor had appeared at the Section 341 meeting nor filed any pleading and the trustee had filed his certificate of no assets. Such cases cause (hopefully well founded) queries in this Judge's mind as to the moral fiber of some debtors and the ethical standards of some counsel. Probably judges, like Tennyson's Six Hundred, should eschew such queries and ride only through the valley of valuation, adversary, stay and confirmation.

■ Based on the foregoing the Court then considers the three questions raised by the pleadings. First, should the Court consider the "suggestions" of the Bank? The answer is no. The statute and the Congressional intent are clear. Not only the determination of substantial abuse but the process by which such a determination is initiated and conducted shall be within the purview and control of the Court alone. The Court will, therefore, disregard the "suggestions" of the Bank.

Second, does the intervention of a creditor mean that the entire well is poisoned and that a Court cannot, within its exclusive domain, make an independent finding of substantial abuse? This answer is more complex. If the comments of Senator Metzenbaum are applied literally, the answer is yes. However, this Court is not convinced that the statute itself codifies what the Senator said.

The so called "Consumer Amendments of 1984" were hammered out by a conference committee that reflected many different views. No record was published of those deliberations but it seems fair to say that the final product reflected many views. Statesmen and law givers often paint with broader brush strokes than Judges and final interpreters of the end product. This Court simply cannot find in the statutory words the type of prohibition Senator Metzenbaum proclaimed or that debtor espouses.

■ Furthermore, such a ruling would be contrary to the general spirit of the Bankruptcy Code and its encouragement of creditors to participate in the process. Public policy which this Court understands to be that honest debtors should have a fresh start would not be served by saying that a debtor who has abused the process should be rewarded as a result of an overzealous act upon the part of a good faith creditor. The Court is put in mind of the old adage that "Two wrongs do not make a right". If the debtor has abused the system or its spirit, the sin of the creditor in pointing it out does not make the debtor's act proper. The Court, therefore, holds that the Court may make an independent determination as to Section 707(b) substantial abuse, disregarding totally the suggestions of the Bank.

■ Third, should the Court impose sanctions upon the Bank for stepping on the hallowed ground reserved only for the use of the Court? Again the public policy and the philosophy of creditor participation weigh against the stark fact that creditor did file suggestions contrary to the dictates of Section 707(b). Obviously this Court cannot approve or permit such acts but in weighing the potential harm to debtors by isolated acts of this type the Court believes that the general restriction of substantial abuse outweigh any need for the imposition of penalties. The Court strongly suspects that the Bank has learned its lesson and that to further penalize it would serve no useful purpose. Should the Bank persist in such conduct, a far different result might be in order. The Court, therefore, concludes not to impose any sanctions on the Bank.

■ Finally the Court comes to grips with the basic question, is the debtor guilty

of substantial abuse in this case? Debtor has filed amended schedules which now show only $82.00 per month disposable income. The Court after reviewing the schedules has determined that they are realistic and more accurately portray the estimated income and expense posture of the debtor than the original schedules. Counsel for debtors should perceive that required schedules are not to be given short shrift in filing a petition for relief, even in a simple Chapter 7 case. Instead they should analyze what the real expenses of living in today's world are and seek to memorialize them in their initial filing.

There is a second reason for the Court's decision. Section 707(b) says "filed by an individual debtor under this chapter (11 U.S.C. Section 701 et seq.) whose debts are primarily consumer debts". The most substantial debt scheduled by debtor and apparently the only debt to be discharged was $86,747.56 owed to the Lawrence National Bank and Trust Company for a *business debt* not a *consumer debt*. Therefore, the Court, subject to the final report of the Trustee, finds no substantial abuse under Section 707(b).

The Court's decision was reached without resort to any request or suggestion of any party in interest. However, the Court does wish to acknowledge that the Honorable Richard L. Speer, also by independent determination, concluded in the same vein as this Court in the case of *In re Hudson,* 56 B.R. 415 (Bkr.N.D.Ohio 1985). Perhaps the rumored amendment to Section 707(b) allegedly pending in a conference committee in Congress at this time, will alleviate the loneliness of decision in the impractical vacuum created by the present wording of the section.