**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 22 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

In re JEFFREY D. STEWART,

    Debtor.

------------------------

JEFFREY D. STEWART,

    Appellant,

v.

UNITED STATES TRUSTEE,

    Appellee.

No. 98-5000

---

**APPEAL FROM THE UNITED STATES**
**BANKRUPTCY APPELLATE PANEL**
**(BAP No. NO-97-010)**
**(N.D. Okla. No. 96-01624-W)**

---

Richard A. Shallcross of Brewster, Shallcross & De Angelis, Tulsa, Oklahoma, for Appellant.

Edward Himmelfarb (Frank W. Hunger, Assistant Attorney General, and William Kanter, Department of Justice; Martha L. Davis, General Counsel; Jeanne M. Crouse, Executive Office for United States Trustees, with him on the brief), Washington, D.C., for Appellee.

---

Before **BALDOCK, McKAY** and **BRORBY**, Circuit Judges.

**BRORBY**, Circuit Judge.

Appellant Jeffrey D. Stewart appeals from the Bankruptcy Appellate Panel's ("the Panel") decision affirming the dismissal of his Chapter 7 bankruptcy petition. The bankruptcy court dismissed the petition pursuant to 11 U.S.C. § 707(b) for substantial abuse of the provisions of Chapter 7. *In re Stewart*, 201 B.R. 996 (Bankr. N.D. Okla. 1996) (*Stewart I*). In a related decision, the bankruptcy court determined 11 U.S.C. § 707(b) is constitutional. *In re Stewart*, 204 B.R. 780 (Bankr. N.D. Okla. 1997) (*Stewart II*). On appeal, Dr. Stewart challenges several rulings of the bankruptcy court as affirmed by the Panel. *In Re Stewart*, 215 B.R. 456 (B.A.P. 10th Cir. 1997) (*Stewart III*). He contends the bankruptcy judge erred in: (1) allowing the United States Trustee to commence a § 707(b) action for "substantial abuse" on the request or suggestion of his ex-wife; (2) concluding his debts constituted "primarily consumer debts;" (3) concluding the filing of his Chapter 7 petition constituted "substantial abuse" of Chapter 7 provisions; and (4) holding § 707(b) is not void for vagueness and does not violate the equal protection guarantees of the Fourteenth and Fifth Amendments of the United States Constitution. We exercise our jurisdiction under 28 U.S.C. § 158(d) and affirm.

## I. BACKGROUND

Jeffery Stewart and Barbara Teichner married in 1978, and produced four children. During this time, Mr. Stewart performed various odd jobs and periodically attended college. They maintained a minimal standard of living, relying in part on money provided by Barbara's parents. Mr. Stewart also obtained student loans from commercial lenders under government-sponsored programs.

In 1988, Mr. Stewart entered medical school and became romantically involved with another medical student, Patricia Hill. In 1990, he and Barbara divorced. The marital settlement agreement required Mr. Stewart to: (1) pay Barbara $500 monthly alimony until he completed his medical residency, and $25,000 in annual alimony thereafter, with a cap of $2 million or in the event she remarried, a cap of $250,000, and (2) pay child support totaling $2,000 per month, as well as the children's medical and future college expenses. In order to meet these support obligations, Mr. Stewart borrowed over $100,000 in student loans from 1990 to 1992, of which he gave Barbara $60,000 for support and paid $3,000 toward the children's medical expenses; the rest he spent on his living expenses, tuition, and loan processing fees. Prior to, and independent from, the divorce decree and marital settlement, Mr. Stewart agreed to sign two promissory

notes to Barbara's parents for $150,000 and $50,000 for loans they made to him and Barbara during their twelve-year marriage.

In 1992, after graduating from medical school, Dr. Stewart began an internship and residency program in obstetrics-gynecology. At the same time, he ceased making support payments to Barbara and began a proceeding to vacate the marital settlement agreement. Although Barbara defended the agreement and counter-sued for past support, she agreed to reduce Dr. Stewart's child support obligation to $586.82 per month. In 1993, during the pendency of that lawsuit, Barbara remarried. The same year, her father, Mr. Teichner, sued Dr. Stewart on the $150,000 note in a state court proceeding.

In 1994, Patricia Hill began her medical residency. In 1995, she successfully filed a voluntary petition for relief under Chapter 7. Later the same year, she married Dr. Stewart.

In late 1995, while Dr. Stewart remained in arrears for approximately $26,000 in past spousal support and unpaid medical bills for his children, he purchased a 1990 Range Rover for $26,466. In January 1996, the state court denied Dr. Stewart's motion to vacate the divorce decree and granted Barbara a

judgment of $26,077.95 for breach of the marital settlement agreement. In April 1996, the state court granted Mr. Teichner a judgment with interest against Dr. Stewart on the $150,000 promissory note.

Just weeks after the divorce court denied his motion for a new trial, Dr. Stewart filed his voluntary petition for relief under Chapter 7 and filed bankruptcy schedules showing debt totaling $2,548,440.37. In this figure, Dr. Stewart included a sum of $2 million owed Barbara under the marital settlement agreement, rather than the $250,000 actually owed as a result of her remarriage. Dr. Stewart sought discharge of: (1) all his debt obligations to his ex-wife and her parents; (2) his children's medical expenses; (3) all future, contractual post-secondary education expenses for his four children; and (4) other incidental debts including taxes and attorney fees. Dr. Stewart listed, but did not seek to discharge, his student loan debt of $218,000. While Dr. Stewart listed himself as "married," he did not apportion his percentage of the total household expenses or list his wife's income. He listed his occupation as a "physician" at three hospitals, with his monthly income totaling $3,358. He provided captions for the legal proceedings involving Barbara and her father, but did not list the amount owed to Barbara under the judgment against him. On his petition, Dr. Stewart characterized his debts as non-business/consumer debts.

Days later, Barbara filed for relief from the automatic stay of the bankruptcy, under 11 U.S.C. § 362, to allow her to enforce the terms of the divorce decree, the marital settlement agreement and the judgment for support arrears, and to modify child support. The bankruptcy court modified the stay to allow Barbara to commence an action to collect and modify child support, and to exercise her rights to enforce the judgment and take action in connection with Dr. Stewart's appeal of that judgment.

One month after filing his bankruptcy petition, Dr. Stewart completed his residency program and opted to enter a two- to three-year fellowship program specializing in perinatology rather than begin an obstetrics/gynecology practice. His fellowship salary ranged from $34,292 to $37,000 a year. The monetary consequences of his entering a fellowship are appreciable. Had Dr. Stewart entered directly into practice rather than opting for a fellowship, his estimated starting salary as a non-board-certified, perinatology graduate would have ranged from $100,000 to $140,000 – substantially more than his fellowship. However, on completing his fellowship, his estimated earning power increased substantially with the average annual earnings for board-certified obstetrics/gynecology specialists ranging between $175,000 and $325,00, and the highest salaries exceeding $500,000. Dr. Stewart forewent immediate employment as an

obstetrics/gynecology physician and instead chose specialization in the treatment of high-risk pregnancies in order to "help desperately-ill and needy mothers and babies," and because he is "passionately interested in research" which he intends to pursue "regardless of remuneration." *Stewart I*, 201 B.R. at 1002.

In July 1996, Dr. Stewart submitted an amended petition. In amending his schedules, Dr. Stewart slightly increased his expenses and decreased the value of his assets; he also increased his liabilities to $2.6 million. He projected his average monthly income from his new fellowship position at $3,403, and his monthly expenses at $ 7,966, for a monthly deficit of $4,563. His revised monthly expenses schedule reflected his share of the total household expenses, but still did not list his wife's income. He again characterized his debts as nonbusiness/consumer debt.[1]

Based on his revised schedule and after adjusting the inaccurate $2 million

---

[1] At a subsequent hearing, Dr. Stewart testified his living expenses are high because he rents an apartment in Oklahoma City while also renting a home in Tulsa where his physician wife is in residency. He economized by dropping a health club membership, trying to cut food and gas expenses, and dropping disability insurance.

alimony debt, Dr. Stewart's actual total debt reached $837,009,[2] including

$250,000 marital debt,[3] $218,000 in student loans from commercial lenders,

$320,000 debt to his former in-laws[4], and $59,009 for other obligations including

medical bills for his children, attorney fees for litigation of his various suits, and

taxes. *See Stewart III*, 215 B.R. at 460. As to the debt owed to his in-laws, Dr.

Stewart testified his wife received her parents' checks and used the money to

support the family while he attended school; she used the money on house

payments, groceries, pre-school, children's activities, moving expenses, and

family vacations. Similarly, Barbara testified her parents loaned them money for

living expenses to maintain a "certain life style," thus facilitating Dr. Stewart's

education. She noted, however, her parents continued to support them even when

---

[2] The schedules show total unsecured, nonpriority debt of $582,509 and, after adjusting the $2 million alimony debt, a priority debt of $254,500, for a total debt of $837,009. *See Stewart III*, 215 B.R. at 460 n.3.

[3] The actual debt owed Barbara is $238,000, consisting of the $250,000 alimony award minus $12,000 alimony previously paid. This amount apparently includes Barbara's judgment against Dr. Stewart for $26,077.95 for unpaid alimony and children's medical expenses. The Bankruptcy Appellate Panel, for the sake of simplicity, used the $250,000 figure in its calculations, stating the same result occurs using either figure. *Stewart III,* 115 B.R. at 460 n.4. To avoid confusion on appeal, we do the same.

[4] This amount includes the judgment for the original $150,000 promissory note to Mr. Teichner, and the $50,000 promissory note to Mrs. Teichner, both with ten percent interest.

Dr. Stewart did not attend college.[5]

Ten days prior to the filing of Dr. Stewart's amended petition, the United States Trustee, through an Assistant Trustee, filed a motion to dismiss Dr. Stewart's petition under 11 U.S.C. § 707(b) as "substantial abuse" of Chapter 7. The Trustee alleged Dr. Stewart's sole purpose in filing for bankruptcy centered on discharging marital and family obligations, even though he retained the ability to pay a substantial portion of his debts.

In response, Dr. Stewart raised an affirmative defense that the motion was "'tainted' by the request or suggestion made to the Trustee by a party-in-interest" in violation of § 707(b). To support his affirmative defense, Dr. Stewart filed interrogatories and a request for production demanding the Trustee produce

---

[5] Dr. Stewart questions the credibility of his ex-wife's testimony on this subject, stating her testimony substantially differed from that in the proceeding involving her father. Having read that portion of her bankruptcy testimony in which Dr. Stewart's counsel attempted to rebut it with her prior testimony, we disagree her testimony substantially differed. Moreover, credibility determinations are within the sound discretion of the trial judge. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985). In this case, the bankruptcy court relied on Barbara's testimony that the money loaned by her parents went toward facilitating Dr. Stewart's education while maintaining the family in a "certain life style" beyond their reach, thus evidencing the court's belief her testimony was credible. *Stewart I*, 201 B.R. at 1002.

communications between the Trustee and the parties in interest, including Barbara, her parents, or their representatives.  Together with a motion to quash the interrogatories and for a protective order, the Trustee filed a response to the interrogatories, objecting on grounds Dr. Stewart was not entitled:  (1) to irrelevant information not calculated to lead to discovery of admissible evidence, (2) to information subject to the deliberative process privilege, or (3) to probe the mental process of government officials in reaching their decisions.  Without waiving these objections, the Trustee stated "he did not discuss this case with any individual prior to filing the Motion to Dismiss."  In an amended response, the Trustee omitted this statement.  In a memorandum in support of the motion to quash, the Trustee stated he "does not file any pleading, and particularly a motion to dismiss a debtor's petition for substantial abuse, without careful and independent investigation, and certainly not merely at the request or suggestion of a party in interest."

The Trustee also responded to the request for production by producing documents used as part of his investigation.  They included Dr. Stewart's deposition and other documents from Mr. Teichner's proceeding, various transcripts from the bankruptcy proceeding, a variety of medical articles concerning the expenses and income of physicians, and pleadings from the

Stewarts' divorce proceedings. The bankruptcy court granted the motion to quash and struck Dr. Stewart's "taint" defense on relevancy grounds, without ruling on the privileged communications issue.

At the hearing on the Trustee's motion to dismiss, Dr. Stewart made an offer of proof concerning the "taint" allegedly caused by the Assistant Trustee's contact with his ex-wife and her attorney. The offer of proof asserted: (1) creditors sent written and oral requests and documents to the Trustee's office in order to stimulate interest in § 707(b) "prosecution;" (2) his ex-wife and her attorney inappropriately attended the 11 U.S.C. § 341 creditors' meeting held prior to the motion to dismiss; (3) at the meeting, her attorney asked Dr. Stewart questions on issues directly related to a § 707(b) dismissal; and (4) his ex-wife, her attorney, and the Assistant Trustee entered and left the meeting room "together." Dr. Stewart's counsel further claimed the Trustee refused to completely answer his discovery requests. The Trustee objected to the offer of proof, stating Dr. Stewart provided no supporting evidence.

Following the hearing, the bankruptcy court granted the motion and dismissed Dr. Stewart's Chapter 7 petition for "substantial abuse." *Stewart I*, 201 B.R. at 1008. In reviewing the dismissal, the Panel found the bankruptcy court

relied on the following findings of fact in reaching the conclusion "substantial

abuse" occurred:

(1)  Dr. Stewart and his doctor wife possess considerable future earning potential;

(2)  The student loan debts are not dischargeable, so the main effect of the case is discharge of Dr. Stewart's debts to his former wife, her parents, and his children, which he appears to have "no intention of honoring;"

(3)  Dr. Stewart exaggerated his debts and expenses and minimized his income.  While he was not required to include his non-debtor wife's income in his schedules, his failure to do so presented a "seriously misleading picture of his actual financial status;"

(4)  Dr. Stewart's lifestyle was extravagant – "he spends $4,500 more than he takes home every month";

(5)  His new wife obtained a Chapter 7 discharge under effectively fraudulent circumstances just prior to marrying Dr. Stewart;

(6)  Although Dr. Stewart is ineligible for Chapter 13 relief, Chapter 11 is available to him;

(7)  No emergency, disaster or untenable situation existed when he filed bankruptcy; and

(8)  Chapter 7 relief would result in little or no dividend to creditors, and would amount to a reward for Dr. Stewart's own financial improvidence and judicial blessing of an unconscionably one-sided, opportunistic adjustment of his relationship with his domestic creditors.

*Stewart III*, 215 B.R at 460-61 (quoting *Stewart I*, 201 B.R. at 1006-08).


On appeal to the Panel, Dr. Stewart contested the facts supporting findings

2, 3, 5 and 6.  After review of the bankruptcy court's findings, the Panel found

support for finding 2, but agreed with Dr. Stewart and rejected findings 3, 5 and 6. *Stewart III*, 215 B.R. at 461-62.

## I. STANDARD OF REVIEW

Dr. Stewart does not dispute the findings of fact as delineated by the Bankruptcy Appellate Panel. Rather, he disputes the bankruptcy court's and the Panel's conclusion that these facts show "substantial abuse" of Chapter 7 provisions. Dr. Stewart similarly disputes the bankruptcy court's and the Panel's conclusion that his debts are "primarily consumer debts" and that the Trustee's motion to dismiss was not "tainted." We review these legal determinations *de novo*. *See Williamson v. Kay (In re Villa West Assoc.)*, 146 F.3d 798, 802 (10th Cir. 1998); *Kornfeld v. Schwartz (In re Kornfield)*, 164 F.3d 778, 783 (2d Cir. 1999); *First USA v. Lamanna (In re Lamanna)*, 153 F.3d 1, 3 (1st Cir. 1998). Similarly, we review Dr. Stewart's constitutional challenge to § 707(b) *de novo*. *See Johnston v. Cigna Corp.*, 14 F.3d 486, 489 (10th Cir. 1994), *cert. denied*, 514 U.S. 1082 (1995).

## III. DISCUSSION

### A. Taint

Having set out the pertinent facts and our standard of review, we turn to the

-13-

issues presented on appeal. We begin with Dr. Stewart's argument the bankruptcy judge erred in granting the United States Trustee's § 707(b) motion for dismissal after the Trustee allegedly received a suggestion of abuse from Dr. Stewart's ex-wife. Alternatively, Dr. Stewart contends the Trustee failed to meet an affirmative or mandatory burden of showing he conducted an independent investigation prior to filing such a motion. The Trustee neither admits nor denies an interested party made a request or suggestion of "substantial abuse," but contends under § 707(b), a United States Trustee can file a motion to dismiss a petition "in the interest of the proper administration of the bankruptcy system" notwithstanding any request or suggestion of a creditor.

We begin by examining the statute at issue. In 1984, Congress enacted 11 U.S.C. § 707(b), which, in pertinent part, stated:

> After notice and a hearing, the court, on its own motion *and not at the request or suggestion of any party in interest*, may dismiss a case ... [for] substantial abuse ....

(Emphasis added.) *See Trustee v. Joseph (In re Joseph)*, 208 B.R. 55, 59 (B.A.P. 9th Cir. 1997) (quoting 1984 version of statute). Under this provision, the court could dismiss a petition *sua sponte*, but arguably not at the request or suggestion

-14-

of a party in interest.[6]  However, this provision caused confusion over whether the

United States Trustee also could bring a § 707(b) motion.  *See In re Joseph*, 208

B.R. at  59; *see also In re Christian*, 804 F.2d 46, 49 (3d Cir. 1986) (pre-1986

amendment case raising, but not deciding, issue of Trustee's standing to bring

motion).  To remedy any confusion, in 1986 Congress amended § 707(b), which

now reads:

> After notice and a hearing, the court, on its own motion *or on a motion by the United States trustee*, but not at the request or suggestion of any party in interest, may dismiss a case ... [for] substantial abuse ....

11 U.S.C. § 707(b) (emphasis added); s*ee also Zolg v. Kelly (In re Kelly)*, 841

F.2d 908, 911-12 & n.2 (9th Cir. 1988) (citing the Bankruptcy Judges, United

States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub. L. No. 99-554,

title II, § 219(b), 100 Stat. 3088, 3100 - 3101 (1986)).


Dr. Stewart contends the phrase "but not at the request or suggestion of any

party in interest" is unambiguous and modifies the phrase "on its own motion or

on a motion of the United States Trustee."  As a result, he argues § 707(b) clearly

---

[6] *But see In re Campbell,* 63 B.R. 702, 705 (Bankr. W.D. Mo. 1986) (pre-1986 amendment case holding suggestion of interested party made directly to court does not mean "entire well is poisoned"; judge may make an independent determination of substantial abuse, disregarding the suggestion made).

prohibits the Trustee from filing a motion once a party in interest requests or suggests such a motion. We disagree with this interpretation.

In considering the same issue, the Fourth Circuit determined the operative phrase "but not at the request or suggestion of any party in interest" simply modifies what the court can do, since "the court" is the subject of the sentence. *Trustee v. Clark (In re Clark)*, 927 F.2d 793, 797 (4th Cir. 1991); *accord In re Kornfield*, 164 F.3d at 784. This construction is consistent with Congress' 1986 amendment allowing the Trustee to bring a motion, but not changing the original provision that the court may initiate a dismissal *sua sponte*, "but not at the request or suggestion" of an interested party. As the Fourth Circuit stated:

> This interpretation is bolstered by the fact that it does not interfere with the purpose of § 707(b)'s provision that parties in interest cannot address substantial abuse motions *directly to the bankruptcy court*. The trustee's ability to consider suggestions by creditors will not result in harassment of debtors because the trustee must make an independent judgment about whether it is appropriate to file a § 707(b) motion to dismiss. Moreover, barring the trustee from acting at the suggestion of a creditor could have the negative effect of deterring interested persons from making relevant information available to the trustee. This could impede significantly the trustee's obligation to investigate possibilities of substantial abuse.

*In re Clark*, 927 F.2d at 797 (emphasis added) (citation omitted).

The Second Circuit similarly recognizes that § 707(b) suggestions made

-16-

directly to the Trustee by interested parties are appropriate because "the Bankruptcy Rules themselves implicitly recognize the legitimacy of such participation" in the process. *Kornfield*, 164 F.3d at 784. This participation often begins with the first meeting of creditors, where a Panel or Assistant Trustee may collect sufficient information to spur the Trustee into filing a § 707(b) motion. *See In re Morris*, 153 B.R. 559, 562 (Bankr. D. Or. 1993) (creditors attending § 341 creditors' meeting are invited to ask the debtor specific questions about the debtor's financial affairs, which may trigger the Trustee to file a § 707(b) motion). Under Dr. Stewart's narrow interpretation of the statute, an interested party's participation at this or any time during the bankruptcy could be construed as a "suggestion" automatically "tainting" the process so no dismissal may occur. We agree that barring the Trustee from acting at the suggestion of a creditor could deter interested persons from making relevant information available to the Trustee and significantly impede the Trustee's obligation to investigate possibilities of substantial abuse. *See In re Clark*, 927 F.2d at 797.

We further note the record itself contained sufficient information to put the Trustee on notice of Dr. Stewart's possible abuse, without any suggestion or assistance from Dr. Stewart's ex-wife or her parents. For example, Dr. Stewart's initial petition and schedules showed enormous debt totaling over $2,500,000,

consisting primarily of a $2 million debt to his ex-wife; the divorce documents, however, showed an outstanding marital obligation of only $250,000. In addition, while Dr. Stewart provided information of his married status, he did not apportion his percentage of shared household expenses. Even though Dr. Stewart truthfully listed his occupation as a "physician" and itemized his monthly income as $39,600 a year, the fact a physician earned so little also could cause a Trustee to question the veracity of the petition and investigate.

Dr. Stewart contends even if interested parties did not "taint" the process, the Trustee nevertheless failed to show he conducted an "independent" investigation of the alleged abuse "prior" to filing the motion to dismiss. As the Panel noted, and we agree, the record demonstrates the Trustee undertook an independent investigation concerning Dr. Stewart's possible abuse of the provisions of Chapter 7 prior to filing the motion to dismiss. *See Stewart III*, 215 B.R. at 463. This is substantiated by the documents the Trustee reviewed and later provided to Dr. Stewart as a result of his request for production.

While the Trustee provided sufficient proof of his independent investigation, this proof came after the Trustee filed the motion to dismiss. Dr. Stewart reasons that the Trustee must prove an investigation was conducted

*before* filing the § 707(b) motion. He relies on *In re Morris*, which summarily states a Trustee filing a § 707(b) motion "must demonstrate that [he or she] has independently investigated any allegations of substantial abuse *prior to filing the motion* ... [and] [f]ailure to make this showing may result in the dismissal of the motion." 153 B.R. at 563. We do not believe the *Morris* court intended to require that the showing be made prior to filing the motion, but rather that the independent investigation must precede the motion. We find no supporting authority and can think of no reasons to impose the requirement Dr. Stewart suggests. It is sufficient for the Trustee to make such a showing after filing his or her § 707(b) motion to dismiss.[7]

Accordingly, we hold § 707(b) does not bar the United States Trustee, on a request or suggestion from a party of interest, from investigating, reaching an independent determination, and then filing a motion to dismiss for substantial abuse. *Accord In re Kornfield*, 164 F.3d at 784; *In re Clark*, 927 F.2d at 796. As the Trustee acted appropriately in this case, Dr. Stewart's taint defense must fail.

---

[7] This does not excuse the Trustee from carrying his or her burden in supporting a motion to dismiss or from producing relevant and material documents relied on in filing the motion to dismiss, at the behest of the debtor who is preparing for a hearing on the motion.

## B. Primarily Consumer Debt

We next turn to the issue of whether Dr. Stewart's debt is "primarily consumer debt." Under § 707(b), a court "may dismiss a case filed by an individual debtor ... whose debts are *primarily consumer debts* if it finds that the granting of relief would be a substantial abuse of the provisions" of Chapter 7.[8] 11 U.S.C. § 707(b) (emphasis added). The Bankruptcy Code defines "consumer debt" as "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8). Courts consistently have applied this definition for the purposes of § 11 U.S.C. § 707(b). *See In re Krohn*, 886 F.2d at 126 (applying § 101(7) – the predecessor to § 101(8), which contained the same language); *In re Kelly*, 841 F.2d at 912 (same); *In re Booth*, 858 F.2d 1051, 1054-55 (5th Cir. 1988) (same). "Consumer debt" is further distinguished from "non-consumer" debt as a debt incurred with a "profit motive." *Citizens Nat'l Bank v. Burns (In re Burns)*, 894 F.2d 361, 363 (10th Cir. 1990); *accord Cypher Chiropractic Ctr. v. Runski (In re Runski)*, 102 F.3d 744, 747 (4th Cir. 1996); *In*

---

[8] Congress promulgated § 707(b) as part of the 1984 consumer credit amendments to the Bankruptcy Code. *In re Krohn*, 886 F.2d 123, 125-26 (6th Cir. 1989); s*ee also In re Lamanna*, 153 F.3d at 3-4. Congress passed these amendments in response to an increasing number of Chapter 7 bankruptcies filed each year by non-needy debtors. *See In re Krohn,* 886 F.2d at 125-26 (relying on *In re Walton*, 866 F.2d 981, 983 (8th Cir. 1989)); *In re Lamanna*, 153 F.3d at 3-4 (relying also on *In re Walton*, 866 F.2d 981).

*re Booth*, 858 F.2d at 1054-55.

In his initial and amended petition and schedules, Dr. Stewart categorized his debt as "nonbusiness/consumer" debt.  Notably, in response to the § 707(b) motion to dismiss, Dr. Stewart seeks to  recharacterize his debts as *not* "primarily consumer debts" to avoid dismissal.  In support of this recharacterization, he argues he used the $320,000 owed his ex-in-laws and $218,000 owed in student loans principally for financing his education; thus, those debts constitute "non-consumer debt" incurred "for the purpose of completing a higher and professional level of education."  As to the $250,000 owed his wife for alimony, he contends this is not the kind of debt Congress envisioned when the consumer credit card industry lobbied it to write § 707(b).[9]  He admits, however, no published decision supports his characterization of alimony as "non-consumer" debt.

In support of his argument, Dr. Stewart relies on two bankruptcy court decisions, *In re Gentri*, 185 B.R. 368 (Bankr. M.D. Fla. 1995), and *First Trust Co. v. Frisch (In re Frisch)*, 76 B.R. 801 (Bankr. D. Colo. 1987), insisting we

---

[9]  While the credit card industry may have lobbied Congress to pass § 707(b), we note Congress did not expressly confine § 707(b)'s use to "credit card" debt, thus giving the courts flexibility to determine potential abuse beyond credit card misuse.

must follow a *per se* rule that monies received by a debtor from his father-in-law constitute "non-consumer" debt. Despite Dr. Stewart's insistence, these cases are distinguishable and constitute non-persuasive, non-binding authority. The court in both cases failed to examine the purpose for which the debtor incurred the loans. In *Gentri*, the court based its finding that medical education loans to the debtor from his former father-in-law constituted "business debt" solely on the Trustee's admission of that characterization. 185 B.R. at 373. In *Frisch*, the court summarily concluded an intra-family loan between the debtor and his former father-in-law was not "consumer debt" in light of the creditor's failure to provide any authority for the proposition intra-family loans constitute consumer debt. 76 B.R. at 803.

Unlike these cases, the record in this case shows the actual purpose for which Dr. Stewart used the intra-family loans. In fact, Dr. Stewart's own testimony supports the finding he used the money predominantly for family living expenses rather than for direct educational costs. *Stewart III*, 215 B.R. at 465. Dr. Stewart testified his ex-wife used the money to support their family, including use for house payments, groceries, pre-school, children's activities, moving expenses, and family vacations. Nothing in the record convinces us the main purpose of these loans was to finance Dr. Stewart's actual educational expenses.

Rather, Dr. Stewart used the money to support his family because he did not earn enough for his family to live comfortably. Notably, this support continued even during those times when Dr. Stewart did not attend college. Thus, the intra-family loans Dr. Stewart received for household and family expenses are "consumer debt."

The Panel concluded Dr. Stewart's student loans totaling $218,000 constitute "consumer debt" because the money was used for dual family and personal purposes. Due to the lack of evidence in the record and authority to guide us, we are unwilling to characterize the entire $218,000 as consumer debt. However, based on the evidence in the record, we can comfortably conclude a substantial portion of Dr. Stewart's student loan debt is indeed "consumer debt."

We start by noting nothing in the record indicates the actual cost of Dr. Stewart's tuition, books, or other direct educational expenses as compared to the portion of student loans used for personal, family, and household expenses. Moreover, little or no binding or persuasive authority exists to help us determine the characterization of educational expenses such as books, tuition, and room and

board as either consumer or business debt.[10]

The record does, however, establish a substantial amount of Dr. Stewart's loans went toward his family's expenses. As to student loans received *during* their marriage, Dr. Stewart's testimony, read in its entirety, together with his brief on appeal, establishes he used a portion of the money on family expenses in addition to any direct educational costs. Specifically, in his brief, Dr. Stewart admits he used his student loan money during his marriage to pay for tuition and books as well as to support "his five dependents." Finally, the record shows during the two years following their divorce, Dr. Stewart obtained over $100,000 in student loans, paying Barbara $60,000 of it for support obligations and $3,000 on his children's medical expenses. Under these circumstances, an appreciable portion – $63,000 – of his student loans went toward family expenses, which fairly may be characterized as "consumer debt."

Finally, as to the alimony debt of $250,000, the weight of the case law on this issue conclusively shows it is a "consumer debt" if it is based on a non-profit

---

[10] Dr. Stewart testified the student loans received *prior* to his 1978 marriage went solely toward tuition, books, and room and board. However, the record shows he received only $660 in student loans prior to that time. This is a mere fraction of the $218,000 owed on student loans.

motive. *See, e.g.*, *In re Kestell*, 99 F.3d 146, 149 (4th Cir. 1996) (alimony, child support, and lump-sum award are considered "consumer debt" as they were not incurred with a profit motive or in connection with a business transaction); *In re Traub*, 140 B.R. 286, 290 (Bankr. D. N.M. 1992) (property settlement owed ex-wife is consumer debt as it is a distribution of the net value of the community interest of the debtor's medical practice and not owed because of a profit-seeking activity); *In re Palmer*, 117 B.R. 443, 447 (Bankr. N.D. Iowa 1990) (lump-sum alimony award is consumer debt because the debt was created to allow the debtor to retain ownership of the home and his pension). In this case, the weight of the evidence suggests the alimony owed to Dr. Stewart's ex-wife is for her support and benefit, and not for any profit motive. Therefore, it constitutes "consumer debt" for the purposes of § 707(b).

Having conclusively determined the debt owed Dr. Stewart's ex-wife and her parents, and at least a portion of the student loan debt, are "consumer debt," we next must determine whether Dr. Stewart's total debt is *primarily* "consumer debt" for the purposes of a § 707(b) dismissal. Dr. Stewart suggests that even if some of the debt owed to his creditors is "consumer debt" it is not "primarily" consumer debt as required under § 707(b). Dr. Stewart suggests "primarily" means the overall "ratio" of "consumer debt" to "total debt" must exceed fifty

percent.

The Bankruptcy Code does not define "primarily," and only a few of our sister circuits have defined "primarily" under § 707(b). Noting the word "primarily" is not an ambiguous or difficult word to understand, and is defined in Webster's Dictionary as "for the most part," the Ninth Circuit determined it to mean consumer debt must exceed more than half the total debt for dismissal under § 707(b). *See In re Kelly*, 841 F.2d at 913, 916.[11] In a non-bankruptcy context, we similarly defined "primarily" as meaning more than fifty percent. *Bohn v. Park City Group, Inc.*, 94 F.3d 1457, 1461 (10th Cir. 1996) (recognizing the Department of Labor, as a "good rule of thumb," defines "primary duty" to mean the major part, or over fifty percent, of the employee's time). Finding no cases to the contrary, we therefore define "primarily" in the context of § 707(b) as meaning consumer debt exceeding fifty percent of the total debt.

---

[11] The Fifth Circuit agrees, but goes one step further by also requiring that the actual number of individual consumer debts must exceed at least half the total number of debts. *See In re Booth*, 858 F.2d at 1055. In other words, even if the debt owed to *one* creditor is "consumer debt" and constitutes ninety-nine percent of the entire debt, if the remainder of the debt is owed to *ten* other creditors, the total debt is not "primarily" "consumer debt." Believing this requirement is illogical, we reject it.

Applying this definition to the instant case, Dr. Stewart's actual total debt is $837,009. Of that amount, $633,000 is "consumer debt" ($320,000 owed to his former in-laws, at least $63,000 of the $218,000 in student loan debt, and $250,000 in alimony). This amount exceeds fifty percent of the total debt. Hence, we determine Dr. Stewart's debt is "primarily consumer debt" for the purposes of § 707(b), and, therefore, his petition may be dismissed under § 707(b), but only if substantial abuse occurred.

C. Substantial Abuse

Under the provisions of § 707(b), a court "may dismiss a case filed by an individual debtor ... if it finds that the granting of relief would be a *substantial abuse* of the provisions" of Chapter 7. *See* 11 U.S.C. 707(b) (emphasis added). The bankruptcy statutes do not define "substantial abuse," and this court has never undertaken to define the phrase in the context of § 707(b). Consequently, we look to other circuits, which agree the debtor's ability to repay his debts out of future earnings is a primary factor in determining if substantial abuse occurred. *See In re Kornfield*, 164 F.3d at 784; *In re Lamanna*, 153 F.3d at 4-5; *In re Koch*, 109 F.3d 1285, 1288 (8th Cir. 1997); *In re Green*, 934 F.2d 568, 572 (4th Cir. 1991); *In re Krohn,* 886 F.2d at 126; *In re Kelly*, 841 F.2d at 914. To a certain degree, however, these courts differ on what, if any, other factors should be

considered in determining if "substantial abuse" occurred.

Some courts regard ability to repay debt as dispositive in determining whether substantial abuse occurred. *See In re Kelly,* 841 F.2d at 914-15 (only factor overriding primary factor of inability to pay is "bad faith"); *In re Koch*, 109 F.3d at 1288 (substantial ability to repay, measured by the debtor's ability to repay debts under a hypothetical Chapter 13 filing, alone is sufficient to warrant a § 707(b) dismissal).

The Fourth Circuit relies on a "totality of the circumstances" standard. *See In re Green*, 934 F.2d at 572-73. It believes that while the debtor's ability to repay his debts is a primary factor, other factors *must* be considered. *Id.* These other factors include, but are not limited to: (1) sudden illness, calamity, disability, or unemployment; (2) cash advances and consumer purchases in far excess of ability to repay; (3) excessive or unreasonable family budget; (4) accurate reflection of true financial condition in the debtor's schedules and statements of income and expenses; and (5) the debtor's good faith. *Id.*

Other courts appear to use a hybrid standard. They believe the debtor's ability to pay may alone be sufficient to warrant dismissal, but in evaluating the

"totality of the circumstances," acknowledge it may be appropriate to consider other relevant factors. *See In Re Lamanna*, 153 F.3d at 5; *In re Krohn*, 886 F.2d at 126. Those factors may include: (1) whether the debtor enjoys a stable source of future income; (2) whether the debtor is eligible for adjustment of debt through Chapter 13; (3) whether state remedies exist to ease the financial predicament; (4) the degree of relief obtainable through private negotiation; and (5) whether the debtor's expenses can be significantly reduced without depriving him of adequate food, clothing, shelter and other necessities. *See In re Krohn*, 886 F.2d at 126-27; *In re Lamanna,* 153 F.3d at 4-5 (factors in *Krohn* regarded as nonexclusive list of relevant considerations).

After careful consideration, we adopt the "totality of the circumstances" standard. While we agree ability to pay is a primary factor in determining whether "substantial abuse" occurred, we believe other relevant or contributing factors, such as unique hardships, must also be examined before dismissing a Chapter 7 petition. Conversely, where an inability to pay exists, we believe other factors may nevertheless establish substantial abuse. We recognize the factors articulated by the other courts as instructive, but conclude they are not inclusive of all factors considered. A substantial-abuse analysis must be made on a case-by-case basis.

In applying this standard, we begin by looking at whether Dr. Stewart can repay his debts. *See In re Green*, 934 F.2d at 572. During his fellowship, Dr. Stewart's monthly expenses of $8,000 clearly exceeded his income of $3,400, so his ability to repay his debt was greatly diminished for the two- to three-year length of his fellowship. However, having instead chosen and then completed his fellowship, Dr. Stewart's earning potential increased to $175,000 - $325,000 a year, so his monthly earning potential well exceeds his monthly expenses.[12] Hence, Dr. Stewart possesses the financial ability to pay his expenses and repay his debt within a reasonable time. *See In re Kornfield*, 164 F.3d at 784. Seeking a discharge of debt under these circumstances evidences "substantial abuse" under § 707(b).

Under the "totality of the circumstances" standard, we must also look at other relevant factors to see if "substantial abuse" occurred. One factor to consider is whether Dr. Stewart suffered any unique hardships, such as sudden illness, calamity, disability, or unemployment. *See In re Green*, 934 F.2d at 572-73. He did not. Dr. Stewart suffered no emergency, disaster, or untenable situation when he filed his bankruptcy petition. *Stewart I*, 201 B.R. at 1007;

---

[12] At oral argument, counsel for the Trustee noted Dr. Stewart successfully completed his fellowship.

*Stewart III*, 215 B.R. at 461. Another factor is whether his cash advances and consumer purchases far exceeded his ability to pay at that time. *Id.* They did. Dr. Stewart lived an extravagant lifestyle, spending $4,500 more than his monthly take-home pay. *Stewart I*, 201 B.R. at 1007; *Stewart III*, 215 B.R. at 461.[13] Bankruptcy relief is not intended to remedy the consequences of extravagant spending.

Another factor to consider is whether Dr. Stewart will enjoy a stable source of future income. *See In re Krohn*, 886 F.2d at 126-27. This factor is met through Dr. Stewart's successful completion of his fellowship and resulting appreciable earning power as a specialty physician. The next factor is whether Dr. Stewart's expenses can be significantly reduced without depriving him of adequate food, clothing, shelter, and other necessities. *Id.* Dr. Stewart's actual expenses are clearly excessive and can be reduced. S*ee Stewart III*, 215 B.R. at 462. Moreover, given his current earning power, even these excessive expenses

---

[13] The bankruptcy court and Panel disagreed on whether Dr. Stewart's petition and schedules accurately reflected his true financial condition. *Compare Stewart I*, 201 B.R. at 1006 *with Stewart III*, 215 B.R. at 461. This is another factor to consider under "the totality of the circumstances" standard. *See In Re Green*, 934 F.2d at 572-73. Regardless of which position is correct, under "the totality of the circumstances," other factors we consider sufficiently establish "substantial abuse."

can clearly be met without depriving him of any necessities. We further note Dr. Stewart does not qualify for Chapter 13 relief, *see id.*, which weighs against dismissal. *See In re Kohn*, 886 F.2d at 126-27. However, Dr. Stewart fails to show he is unable to obtain relief through private negotiation, which weighs in favor of dismissal. *See id.*

Finally, we look to the debtor's good faith as a factor under "the totality of the circumstances." *See In re Green*, 934 F.2d at 572-73. We note Dr. Stewart filed his petition immediately after unsuccessful litigation with his wife and former father-in-law in an attempt to discharge judgments he is legally obligated to pay. Ironically, he also seeks to discharge his legal obligation to pay his children's college expenses even though his in-laws provided him money over a twelve-year period so he could pursue his own education. Moreover, he now attempts to discharge those intra-family loans.

Just as ironic is Dr. Stewart's contention he opted for a low-paying fellowship for the humanitarian reason of servicing needy children and mothers, while disregarding his own children's medical expenses and the financial support of their mother. In fact, Dr. Stewart purchased a $26,000 vehicle rather than pay these expenses at the time they became due and owing. In filing his petition, Dr.

Stewart sought discharge of his family obligations, while (1) pursuing a fellowship that paid substantially less than his earning potential, and (2) knowing he could, and now will, enjoy a substantially higher income. We are reminded of the old adage, "having your cake, and eating it too." Indeed, under "the totality of the circumstances," we question Dr. Stewart's good faith in filing his petition and conclude his actions constitute "substantial abuse" within the meaning of § 707(b). For these reasons, the bankruptcy court correctly dismissed his petition under § 707(b).

## D. Constitutionality

As an alternative argument, Dr. Stewart asserts § 707(b) is unconstitutional because it is (1) void for vagueness and (2) in derogation of the equal protection guarantees of the Fourteenth and Fifth Amendments. Specifically, Dr. Stewart laments the words "substantial abuse" and "primarily consumer debts" are so vague as to render the statute meaningless and unenforceable. Dr. Stewart further contends no "rational basis" exists for Congress to choose to discriminate against only consumer debtors under § 707(b), to the exclusion of business debtors.

Section 707(b) has survived similar constitutional challenges in the Ninth Circuit and several bankruptcy courts in this and other circuits. *See In re Kelly*,

841 F.2d at 916-17 (challenged for vagueness); *Heller v. Foulston (In re Heller)*, 160 B.R. 655, 661 (Bankr. D. Kan. 1993) (same); *In re Higginbotham,* 111 B.R. 955, 965 (Bankr. N.D. Okla. 1990) (challenged for vagueness and violation of equal protection guarantees); *In re Wilkes*, 114 B.R. 551, 553 (Bankr. W.D. Tenn. 1989) (reviewed for vagueness and violation of due process and equal protection guarantees); *In re Keniston*, 85 B.R. 202, 204-05 (Bankr. D. N.H. 1988) (same).

One of the main purposes of bankruptcy law is to relieve honest debtors from the weight of oppressive indebtedness, thereby allowing them to start afresh. *See In re Krohn*, 886 F.2d at 125. While Congress promulgated bankruptcy laws to assist needy debtors, a constitutional right to bankruptcy discharge does not exist. *United States v. Kras*, 409 U.S. 434, 446 (1973). Bankruptcy laws regulating economic activity do not involve constitutionally protected conduct and, thus, are subject to "a quite lenient test for constitutional sufficiency." *In re Kelly*, 841 F.2d at 915 (considering constitutionality of § 707(b)). *See also Kras*, 409 U.S. at 446; *Otasco, Inc. v. United States (In re South)*, 689 F.2d 162, 165 (10th Cir. 1982), *cert. denied*, 460 U.S. 1069 (1983). With this in mind, we proceed to the constitutional issues raised.

## 1. Vagueness

Because discharge in bankruptcy is not a constitutional right and is only a civil remedy afforded by statute, we agree that "civil statues, such as § 707(b), are subject to less rigorous constitutional standards than criminal statutes, and ... where First Amendment freedoms are not concerned, the rule is that a statute is unconstitutionally vague ... [when] 'no standard of conduct is specified at all.'" *Stewart III*, 215 B.R. at 464 (quoting *Higginbotham*, 111 B.R. at 965.)

We further agree § 707(b) does in fact provide a standard of conduct, "even though the details must be worked out by judicial decisions." *Id.* Section 707(b) derives "much meaningful content from [its legislative purpose], its factual background, and the statutory context." *In re Kelly*, 841 F.2d at 916 (internal quotation marks and citation omitted). The fact that § 707(b) does not define the terms "primarily" or "substantial abuse," does not make the provision constitutionally void. As the *Kelly* court noted, "[t]he Constitution does not require the legislature to incorporate Webster's into each statute in order to insulate it from vagueness challenges." *Id.* While § 707(b) unavoidably subjects debtors to judicial differences of opinion, we agree "it does not subject them to judicial whim without 'guidance or constraint.'" *Higginbotham*, 111 B.R. at 966 (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 367 (1886)). Indeed, case law

reflects the bankruptcy courts have had little difficulty fashioning a relatively uniform approach to resolving § 707(b) motions. *See Kelly*, 841 F.2d at 916. For these reasons, we conclude § 707(b) is not constitutionally void for vagueness.

## 2. Equal Protection

The bankruptcy court, applying a "rational basis" standard, held § 707(b) does not violate the equal protection provisions of the Constitution. *Stewart II*, 204 B.R. at 782. However, in reviewing the bankruptcy court's decision, the Panel avoided the equal protection issue by construing the statute no more broadly than other statutes that generally permit dismissal of bankruptcy petitions.[14] *Stewart III*, 215 B.R. at 463-64. The Panel concluded, without giving thorough, delineated examples, that the case-by-case analysis applied to motions to dismiss under § 707(b) is substantially similar to the case-by-case analysis given dismissal motions under other, more general bankruptcy provisions that apply to business debtors.

---

[14] The Panel compared § 707(b) motions to dismiss with motions to dismiss under 11 U.S.C. §§ 105 and 707(a). These statutes give bankruptcy courts general jurisdiction to dismiss abusive petitions under other provisions of the Bankruptcy Code, without regard to classification. *See, e.g.,* 11 U.S.C. § 105 (granting courts *sua sponte* power to "prevent an abuse of process"), and 11 U.S.C. § 707(a) (granting general jurisdiction to dismiss petitions, but not specifically mentioning "abuse"); *see also Stewart II*, 204 B.R. at 782.

On appeal, the Trustee asserts an equal protection analysis is necessary because a difference does exist between the treatment of consumer and business debtors under the bankruptcy code. The Trustee contends a rational basis exists justifying the dissimilar treatment given consumer and business debtors.

We acknowledge those cases instructing us to avoid resolution of the constitutionality of a statute if a reasonable, alternative statutory interpretation poses no constitutional question. *See Hall v. Commissioner of Internal Revenue*, 30 F.3d 1304, 1306 (10th Cir. 1994); *Turner v. United States Parole Comm'n*, 934 F.2d 254, 257 (10th Cir.), *cert. denied*, 502 U.S. 885 (1991). However, where, as here, the legislature clearly intended to separately classify consumer debtors, and the constitutional issue can be easily resolved, we determine it more prudent to resolve the constitutional issue than "press statutory construction 'to the point of disingenuous evasion.'" *United States v. Locke*, 471 U.S. 84, 96 (1985) (quoting *George Moore Ice Cream Co. v. Rose*, 289 U.S. 373, 379 (1933)). Specifically, we find it prudent to refrain from applying a statutory interpretation that might pervert the clear purpose of § 707(b) to separately classify consumer debtors and broaden the judiciary's ability to dismiss consumer petitions for substantial abuse. *Cf. Heckler v. Mathews*, 465 U.S. 728, 741-42 (1984). Therefore, we proceed to the constitutional issue and review § 707(b) to determine if it impermissibly

discriminates against consumer debtors in violation of the equal protection provisions of the Constitution.

We review § 707(b) and its distinction between consumer and business debtors under a "rational basis" analysis. This is because the distinction between consumer and business debtors does not implicate a fundamental right or affect a suspect classification. *See generally Kras*, 409 U.S. at 446 (finding "bankruptcy legislation is in the area of economics and social welfare," and no constitutional right exists to obtain a discharge of one's debts in bankruptcy). A classification involving neither a fundamental right nor a proceeding along suspect lines is accorded a strong presumption of validity. *Heller v. Doe*, 509 U.S. 312, 319 (1993). "A statute is presumed constitutional ... and '[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.'" *Id.* at 320 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).

Keeping § 707(b)'s strong presumption of validity in mind, we must determine if a rational relationship exists between the disparity of treatment between consumer and business debtors and some legitimate governmental purpose. *Heller*, 509 U.S. at 320. Section 707(b) must be upheld against Dr.

Stewart's equal protection challenge if "any reasonably conceivable state of facts" exists providing a rational basis for the separate classification of consumer and business debtors. *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993). An economic classification such as that applied in § 707(b) does not fail rational basis review merely because in practice it results in some inequality. *See Dandridge v. Williams*, 397 U.S. 471, 485 (1970).

Congress enacted § 707(b) for two reasons. First, it wanted to address the problem of consumer debtors taking inordinate advantage of modern easy-credit practices, running up consumer debt, and then seeking discharge of that debt through Chapter 7 bankruptcy. *See In re Lamanna*, 153 F.3d at 3. Congress apparently felt § 707(b) would remedy the problem of consumer debtors unfairly taking advantage of Chapter 7 even though they are able over time to pay off their debts. *See id.*; *In re Kornfield*, 164 F.3d at 781. Second, Congress wanted to give the courts a specific mechanism to more readily dismiss petitions by abusive consumer debtors. As the bankruptcy court aptly noted, § 707(b) was not enacted to narrow and discourage court review of abuse cases to those involving consumer debt, but to broaden and encourage such review in light of the fact many bankruptcy courts were not dismissing abusive consumer petitions. *Stewart II*, 204 B.R. at 781-82. Thus, "[s]ection 707(b) was enacted in response to ...

judicial abdication of authority." *Id.*

Congress' legitimate concern over consumer abuse of Chapter 7 continues today given easy-credit practices involving signature loans and credit cards. As the bankruptcy court in this case reasoned, § 707(b) addresses a type of bankruptcy case – consumer debt – especially liable to abuse and deserving review. *Id.* at 782.

> That type of case involves an individual debtor who ... takes advantage of modern easy-credit practices to accumulate debts, for the immediate purpose of satisfying his private appetites and maintaining or enhancing his personal qualities and lifestyle, or those of his dependents – often in circumstances which offer creditors little security, because the benefits acquired by the debts are used up ("consumed") by the debtor himself and assimilated to his person – and who effectively avoids repayment by keeping his unconsumed property and his income from wages or professional earnings to himself and from his creditors....

*Stewart* I, 201 B.R. at 1004. While consumer debtors for the most part "consume" the benefits acquired by their debt, it is reasonable to assume most business debtors accrue debt to obtain tangible, secured business assets, which thereby gives creditors more protection in recovering those assets and conceivably lessens the possibility of bankruptcy abuse. Therefore, in enacting § 707(b), Congress addressed the more immediate concern it had with consumer abuse of Chapter 7 and the bankruptcy courts' failure to dismiss abusive consumer petitions. In doing so, it was not necessary for Congress to similarly address

business debtor abuse.  *See, e.g., Dandridge*, 397 U.S. at 486-87; *Williamson v. Lee Optical of Okla.*, 348 U.S. 483, 489 (1955).

Based on the above, we conclude a "reasonably conceivable state of facts" exists providing a rational basis for the separate classification and treatment of consumer and business debtors under 11 U.S.C. § 707.  Specifically, we find it reasonable Congress enacted § 707(b) to counter Chapter 7 abuse by consumers who amass debt through easy credit practices, consume the items purchased, and then seek discharge of their debt even when able to pay.  A rational relationship exists between Congress singling out consumer debtors for dismissal for substantial abuse under § 707(b) and the government's legitimate purpose in preventing consumer abuse, reasonably protecting creditors and empowering the courts with a mechanism to more readily dismiss substantially abusive consumer petitions.  Accordingly, we hold 11 U.S.C. § 707(b) does not violate the equal protection provisions of the Constitution.

For the foregoing reasons, we **AFFIRM** the dismissal of Dr. Stewart's Chapter 7 petition for substantial abuse.