**In re Daniel R. WRIGHT and Diane S. Wright, Debtors.**

**Bankruptcy No. 01–28485–BM.**
**Motion No. 01–6652M.**

United States Bankruptcy Court,
W.D. Pennsylvania.

April 18, 2002.

Joseph M. Fornari, Jr., Office of United States Trustee, Pittsburgh, PA, for Movant.

Mary Jane Jacques, Jacques & Jacques, P.C., Natrona Heights, PA, for Debtors.

### *MEMORANDUM OPINION*

BERNARD MARKOVITZ, Bankruptcy Judge.

The United States trustee has brought a motion pursuant to 11 United States Code § 707(b) to dismiss the above chapter 7 case. Granting debtors a discharge, the United States trustee asserts, would be a substantial abuse of the provisions of chapter 7 of the Bankruptcy Code because their expenses are unreasonable and excessive.

Debtors deny that their expenses are unreasonable or excessive and insist that granting them a discharge would not be a substantial abuse of the provisions of chapter 7 of the Bankruptcy Code.

We will deny the motion of the United States trustee for reasons set forth in this memorandum opinion.

### —FACTS—

Debtors are husband and wife and have two teen-aged sons who are fourteen and thirteen years of age.

Debtors' combined gross annual income exceeded $246,000 in 1999 and exceeded $225,000 in 2000. Debtor Daniel Wright's

income in these years was approximately $242,000 and $220,000, respectively. Debtor Diane Wright's income from her employment as an aerobics instructor during these years was $4,000 and $4,500, respectively.

Their income declined precipitously when debtor Daniel Wright was laid off in February of 2001, from his job as vice-president for marketing with American Management Systems, Inc. due to a decline in business.

Debtor Daniel Wright began a new job in the Detroit area as an account representative—i.e., a salesman—for CCI, Inc. in July of 2001. His present annual gross income from his new employment is $80,000 per year. He testified that he travels on average four days a week to various state capitals throughout the Midwestern United States and averages 1,000 miles per week driving his own vehicle, without additional compensation for expenses, to these destinations.

Debtor Diane Wright and debtors' two sons stayed behind in Pittsburgh for approximately two months after debtor Daniel Wright relocated to Detroit to begin his new job. They joined him there in September of 2001. Debtor Diane Wright left her job as an aerobics instructor when they moved to Detroit and since then has not found other employment. She spends her time looking after their two sons and maintaining the family household. Her certification as an aerobics instructor has lapsed. She has a college degree in accounting but has not worked as an accountant since the birth of their first child some fourteen years ago.

Debtors filed a voluntary joint chapter 7 petition on August 16, 2001. Their schedules indicate assets with a declared total value of $402,612.91 and liabilities totaling $433,823.42.

Schedule A, Real Property, listed debtors' personal residence as having a declared value of $300,000.

Schedule B, Personal Property, listed various items of personalty with a declared value of $102,612.91. Included among these assets are an ERISA-qualified pension in the approximate amount of $27,000 and an ERISA-qualified 401(k) account in the approximate amount of $30,600. A 1998 Mercedes Benz automobile with a declared value of $18,542 and a 1999 Ford Expedition with a declared value of $20,750 also were listed.

On Schedule C, Exemptions, debtors claimed an exemption in the amount of $5,150 in the Mercedes Benz automobile pursuant to § 522(d)(2) and exempted the full amount of the pension and 401(k) account pursuant to § 522(d)(10)(E). No objections to the claimed exemptions were filed within the thirty-day period following the conclusion of the § 341 meeting of creditors.

Schedule D, Creditors Holding Secured Claims, listed various secured debts totaling $341,432.87. Two mortgages totaling $292,348.48 against debtors' personal residence were listed. Security interests in the 1998 Mercedes Benz automobile in the amount of $15,000 and in the 1999 Ford Expedition in the amount of $34,074 also were listed.

Schedule F, Creditors Holding Unsecured Nonpriority Claims, listed general unsecured debt in the amount of $92,390. Included were seven credit card debts totaling $38,972 for "credit card purchases", a line of credit in the amount of $8,478 for "miscellaneous purchases", and a loan in the amount of $44,941 for "credit card consolidation".

Schedule I, Current Income, listed gross monthly income totaling $7,038.18. This included $6,666.66 earned by debtor Daniel

Wright from his new job and $371.52 earned by debtor Diane Wright from her employment as an aerobics instructor. Their combined total monthly net income was listed as $5,387.10.

Schedule J, Current Expenditures, listed monthly expenses totaling $6,435.00, some $1,000 dollars greater than debtors' combined monthly net income. This total included $2,225 for mortgage and utilities payments, $800 for food, $500 for clothing, $500 for transportation, $1,300 for recreation and entertainment, $460 in installment payments for the 1998 Mercedes Benz, and $850 in installment payments for the 1999 Ford Expedition.

Debtors' Statement of Intention indicated that they would surrender their personal residence to the mortgagees and their 1999 Ford Expedition to the creditor having a security interest therein but would reaffirm the debt for the 1998 Mercedes Benz.

The § 341 meeting of creditors was held and concluded on September 26, 2001, after which the chapter 7 trustee reported that this was a no-asset bankruptcy case.

North American Mortgage Company, holder of the first mortgage against debtors' personal residence, brought a motion on November 2, 2001, for relief from stay with respect to the property. Its motion subsequently was granted on November 26, 2001, when neither the chapter 7 trustee nor debtors opposed the motion.

Mellon Bank, which held the security interest in debtors' 1999 Ford Expedition, brought a motion on November 14, 2001, for relief from stay with respect to the vehicle. Its motion was granted on December 7, 2001 when neither the chapter 7 trustee nor debtors objected.

On November 14, 2001, the United States trustee brought the present motion pursuant to 11 United States Code § 707(b) to dismiss debtors' chapter 7 case. The United States trustee alleged that granting debtors a discharge would be a substantial abuse of the provisions of chapter 7 of the bankruptcy Code because of debtors' significant income and excessive expenses.

At some undisclosed time after debtors had relocated to the Detroit area, debtors purchased a new 2002 Jeep Liberty for use by debtor Diane Wright. The monthly installment payments for this vehicle amount to $330, some $520 less per month than were the installment payments for the 1999 Ford Expedition.

On November 29, 2001, some two months after debtors had relocated and two weeks after the United States trustee's motion to dismiss, debtors filed an amended Schedule J. Whereas the original Schedule J listed monthly expenses totaling $6,435, the amended Schedule J listed monthly expenses totaling $5,297, approximately $90 less than their monthly net income.

According to amended Schedule J, debtors spend $1350 per month for renting a three-bedroom apartment located well outside of Detroit; $700 per month for food; $300 per month for clothes; $450 per month for transportation; $790 per month in auto installment payments; and $750 per month on "miscellaneous expenses".

An evidentiary hearing on the United States trustee's motion to dismiss and debtors' opposition thereto was conducted on February 27, 2002, at which time both sides were given an opportunity to offer evidence on the matters at issue here.

—DISCUSSION—

The United States trustee's motion to dismiss is based on § 707(b) of the Bankruptcy Code, which provides in part as follows:

After notice and a hearing, the court, ... on a motion by the United States trustee, ... may dismiss a chapter 7 case by an individual debtor whose debts are primarily consumer if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor....

11 United States Code § 707(b).

The United States trustee concedes that debtors' living expenses perhaps were not unreasonable or excessive before debtor Daniel Wright was terminated from his employment which paid him well in excess of $200,000 per year. But instead of reducing their living expenses to a level that is commensurate with their significantly reduced income, the United States trustee asserts, debtors persist in their previous lavish lifestyle while seeking a chapter 7 discharge without paying anything to their pre-petition general unsecured creditors. Granting debtors a discharge in such a situation, the United States trustee insists, would be a substantial abuse of the provisions of chapter 7 of the Bankruptcy Code.

■ Subsection 707(b) was enacted in response to an ever-escalating number of chapter 7 bankruptcy filings by individuals who were not truly in need of relief. It imposes a restraint upon a debtor's opportunity to obtain relief above and beyond those restraints imposed by §§ 523(a), 707(a), and 727(a) of the Bankruptcy Code. *In re Krohn,* 886 F.2d 123, 126 (6th Cir. 1989); *In re Walton,* 866 F.2d 981, 988 (8th Cir.1989). Congress intended when it enacted § 707(b) to deny bankruptcy relief to debtors who are dishonest or who are not truly in need of relief. *In re Krohn,* 886 F.2d at 126.

■ Two prerequisites must be met for a case to be dismissed in accordance with § 707(b): (1) the debts of the debtor are "primarily consumer" in nature; and (2) granting debtor relief in the form of a discharge would be a "substantial abuse" of the provisions of chapter 7 of the Bankruptcy Code. *Gomes v. United States Trustee,* 220 B.R. 84, 86 (9th Cir. BAP 1998).

A debt is "consumer" in nature if it is incurred primarily for a personal, family, or household purpose. 11 United States Code § 101(8).

Debtors concede that *all* of the debts listed on their schedules are consumer in nature. The only issue that must be resolved here is whether granting debtors relief in the form of a discharge would constitute a "substantial abuse" of the provisions of chapter 7 of the Bankruptcy Code. Debtors vigorously deny that such "substantial abuse" would result if they were granted a discharge.

Congress did not define the term "substantial abuse" anywhere in the Bankruptcy Code but instead left it to bankruptcy courts to give it meaning and to articulate the standard for its application.

■ "Substantial abuse" generally exists for purposes of § 707(b) when a chapter 7 debtor does not truly need a clear field for future effort, unhampered by the pressure of pre-existing debt. *In re Staub,* 256 B.R. 567, 569–70 (Bankr. M.D.Pa.2000).

■ There is universal agreement among courts that an individual debtor's ability to repay his or her debts from future earnings is, at the very least, a primary factor in determining whether substantial abuse would occur in a chapter 7 case. E.g., *Kornfield v. Schwartz (In re Kornfield),* 164 F.3d 778, 784 (2d Cir.1999); *First USA v. Lamanna (In re Lamanna),* 153 F.3d 1, 3 (1st Cir.1998); *In re Koch,* 109 F.3d 1285, 1288 (8th Cir.1997); *In re*

*Green,* 934 F.2d 568, 572 (4th Cir.1991); *In re Krohn,* 886 F.2d at 126; *Zolg v. Kelly (In re Kelly),* 841 F.2d 908, 914 (9th Cir. 1988).

Many courts disagree, however, concerning whether other factors should be considered in determining whether substantial would occur. They have taken one of three approaches. *See In re Stewart,* 175 F.3d 796, 808 (10th Cir.1999).

Some have treated a debtor's ability to repay pre-petition debts as sufficient in and of itself to warrant a determination that substantial abuse would occur. No further inquiry is required. *In re Koch,* 109 F.3d at 1288; *In re Kelly,* 841 F.2d at 914–15.

Other courts have employed a totality-of-the-circumstances standard. While a debtor's ability to repay pre-petition debts is a major consideration, other factors also *must* be taken into account. These include: (1) whether debtor experienced sudden illness, calamity, disability, or unemployment; (2) whether debtor made consumer purchases on the eve of bankruptcy that far exceeded what debtor realistically could repay; (3) whether debtor's personal budget is unreasonable or excessive; (4) whether the schedules and statement of financial affairs accurately portray debtor's financial condition; and (5) whether debtor filed for bankruptcy protection in good faith. *In re Green,* 934 F.2d at 572–73. This list is exemplificative rather than all-inclusive. *In re Stewart,* 175 F.3d at 809.

Yet other courts have employed a "hybrid" standard. While debtor's ability to repay may be sufficient to warrant dismissal in a given instance, it also may be appropriate to consider other relevant factors when considering the totality of the circumstances. *In re Krohn,* 886 F.2d at 126.

■ After considering these various approaches, we conclude that the "totality-of-the-circumstances" approach, as articulated in *In re Green,* 934 F.2d at 572–73, is the appropriate standard. Although a debtor's ability to repay pre-petition debts is a primary consideration for purposes of § 707(b), other considerations must be taken into account when determining the issue of substantial abuse. Under this approach, a debtor's ability to repay debts is not necessarily dispositive. Substantial abuse may be found if other salient considerations so indicate. *In re Stewart,* 175 F.3d at 809. Substantial abuse analysis must proceed on a case-by-case basis. *Id.*

■ Although it is close, consideration of the factors enumerated in *In re Green* leads us to conclude that dismissal of debtors' case is not warranted here. Even though debtors' post-petition expenses are somewhat high and at first glance even appear unreasonable and excessive, substantial abuse would *not* occur if debtors receive a chapter 7 discharge.

Debtors' financial woes began in earnest when debtor Daniel Wright unexpectedly was laid off in February of 2001 from a job which paid him $246,000 in 1999 and $220,000 in 2000. Although debtors', perhaps imprudently, were living "high on the In Household Or Personal Goods" when times were good, the bottom suddenly fell out when he lost his job in February of 2001. A lavish lifestyle they previously could afford overnight became unaffordable.

Debtors incurred no significant consumer debt on the eve of their bankruptcy filing. Their most recent significant unsecured debt ($44,940.87) was a debt consolidation loan incurred in November of 2000, some eight months prior to the bankruptcy filing. The purpose of the loan was to pay some of their staggering credit card debt and to reduce their monthly payments to a

more manageable level. While the need to incur this particular debt should have been a clarion call that debtors were overextended, nothing in the record suggests that it was incurred in anticipation of an impending bankruptcy filing. There also is nothing in the record indicating that debtors' schedules and statement of financial affairs did not accurately portray their financial situation or that debtors otherwise filed their chapter 7 petition in bad faith.

The primary thrust of the United States trustee's motion to dismiss is that debtors' personal budget is unreasonable and excessive and that substantial abuse would result if they received a chapter 7 discharge while their unsecured creditors went away from this case empty-handed.

The United States trustee focuses on certain of debtors' present expenses. While debtors expenses remain considerable, debtors have dramatically reduced them from what they were at the time of their bankruptcy filing. We conclude that these expenses are not unreasonable or excessive under the circumstances presented in this case. Debtors have made a bona fide effort to reduce their living expenses to a reasonable level.

The United States trustee place heavy emphasis on the monthly rent debtors are now paying—i.e., $1,350. We do not think that this expense is unreasonable or excessive under the circumstances presented here.

When they relocated to the Detroit area, debtors had to find a place that was large enough to accommodate themselves and their two teen-aged sons. They attempted to find a house or apartment in or near the city of Detroit but were unable to find rental property that was located in a safe neighborhood and was affordable. Properties located in safe areas were not affordable. Conversely, affordable properties were not located in safe areas. Debtors ultimately had to rent an apartment some fifty miles outside of Detroit that was in a safe area and was affordable.

The apartment debtors rented is not a "Taj Mahal" but instead is a basic three-bedroom apartment. The monthly rent debtors pay might be excessive for a similar apartment in the Pittsburgh area but it does not appear out of line with prevailing rents in the Detroit area, where we are advised that the cost of housing is considerably greater than in the Pittsburgh area.

Debtors, we have noted, spend $460 per month in installment payments for a 1998 Mercedes Benz automobile and $330 per month for a 2002 Jeep Liberty. The United States trustee points to this expenditure of $790 per month as further evidence that debtors' budget is unreasonable and excessive. We disagree under the circumstances presented here.

Debtor Daniel Wright, who drives the Mercedes Benz, needs a reliable vehicle to travel on average 1,000 miles per week to visit potential customers in his employment as salesman. There is no realistic alternative to driving an automobile to visit them. His present employer does not provide him with a vehicle for this purpose, nor does it reimburse him the cost thereof.

An amount was still outstanding on a previous vehicle when debtors bought the Mercedes Benz new in 1998, which amount was "rolled over" into the loan for the Mercedes Benz. After he was laid off from his job in February of 2001, debtor Daniel Wright refinanced the debt owed on the vehicle to reduce the monthly installment payment to $460 while extending the term of the loan to forty-eight months. Debtors now have "negative equity" in the vehicle—i.e., the amount they owe on it is greater than its value. It is doubtful in light of this that debtors could trade in the

Mercedes Benz for another reliable vehicle and pay less than $460 per month for it.

Debtor Diane Wright, who drives the 2002 Jeep Liberty, also needs a dependable vehicle to transport debtors' two sons and to run necessary household errands. Given that they live some fifty miles outside of Detroit in a distant suburb, there is no alternative to her driving an automobile for these purposes. Debtor Daniel Wright drives the Mercedes and is on the road an average of four days a week seeing potential customers.

Once debtors surrendered their 1999 Ford Expedition, for which the monthly installment payment was $850, they had to purchase another reliable vehicle for the use of debtor Diane Wright. When they purchased the 2002 Jeep Liberty, debtors reduced their auto installment payments by $520 per month. Paying $360 per month for a second reliable vehicle is not, in our estimation, unreasonable or excessive under these circumstances.

Debtors also spend $450 per month in transportation costs in addition to their monthly auto installment payments. This amount consists of $350 for gasoline and $100 for vehicle repair and maintenance.

The lion's share of this expense is incurred by debtor Daniel Wright, whose employer does not reimburse him for gasoline he has to purchase for the Mercedes Benz while on the road. Debtor Daniel Wright drives an average of 4,000 miles visiting potential customers. Assuming that the Mercedes Benz averages 20 miles to the gallon and uses premium fuel costing as much as $1.50 per gallon, gasoline for this vehicle would cost as much as $300 per month. He also spends an average of $100 per month for maintenance and repair of the vehicle, which he already has driven approximately 85,000 miles.

In addition to the Mercedes Benz, debtors also must purchase gasoline for the 2002 Jeep Liberty driven by debtor Diane Wright. It would not be unreasonable for her to spend $50 per month to operate the vehicle. Moreover, even though the vehicle is new, some amount is required to perform routine maintenance on it.

We conclude in light of the foregoing that it is not unreasonable in light of circumstances for debtors to spend $450 per month in transportation costs in addition to their auto installment payments.

Debtors also spend $700 per month for groceries and another $300 per month for clothes. These expenditures are not unreasonable or excessive when one considers that debtors have to feed and clothe two teen-aged sons in addition to themselves.

The final expenditure of any moment listed on debtors' budget is for "miscellaneous expenses" totaling $750 per month. Debtor Daniel Wright spends $350 of this amount while debtor Diane Wright spends the remainder.

Debtor Daniel Wright's employer pays for his hotel and his dinner when he is on the road but does not pay for his breakfast or lunch, which he must pay for out of his own pocket. Out of this amount he also must pay for his own haircuts and incidentals and for psychiatric counseling which is not paid for at all by the medical insurance his employer provides. He must pay the entire amount out of his pocket, not just a co-payment.

Debtor Diane Wright pays for haircuts for herself and for debtors' two sons out of her portion of the "miscellaneous expenses". She also pays for their sons' school lunches, school supplies, school events, and music lessons. In addition, she pays out of her own pocket for visits to her therapist for various psychiatric disor-

ders that are not paid for by debtors' medical insurance.

While debtors' "miscellaneous expenses" may not be as spartan as they could be, we do not find them to be sufficiently excessive by themselves to warrant the conclusion that granting debtors a discharge would be a substantial abuse of the provisions of chapter 7 of the bankruptcy Code. Any excessiveness in this regard would not, for instance, be sufficient to fund a meaningful chapter 13 plan.

To summarize, although debtors' monthly expenses appear at first glance to be unreasonable or excessive, closer examination of the totality of debtors' circumstances in this case leads us to conclude that granting debtors a discharge would not be a substantial abuse of the provisions of chapter 7 of the Bankruptcy Code. We do not find fault with the United States trustee for bringing a motion to dismiss pursuant to § 707(b). Only after the record was fully developed at the evidentiary hearing did it emerge that no such substantial abuse would occur in this case.

This is not to say that debtors' present monthly expenses are not significantly greater than one might expect of chapter 7 individual debtors. To the contrary, they are significantly greater. They are so, however, because debtors previously pursued an excessive lifestyle that was heavily laden with debt. Circumstances described above, however, have prevented debtors from reducing their expenditures to a level one normally might expect. Subsection 707(b) does not apply merely because one's expenses are high but where they are unreasonably so in light of circumstances.

An appropriate order shall issue.

### ORDER OF COURT

**AND NOW** at Pittsburgh this **18th** day of **April**, 2002, for reasons set forth in the accompanying memorandum opinion, it hereby is **ORDERED, ADJUDGED,** and **DECREED** that the motion to dismiss pursuant to 11 United States Code § 707(b) brought by the United States trustee is **DENIED**.

It is **SO ORDERED**.